[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. McFarland*, Slip Opinion No. 2020-Ohio-3343.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2020-OHIO-3343

THE STATE OF OHIO, APPELLEE, *v.* MCFARLAND, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. McFarland*, Slip Opinion No. 2020-Ohio-3343.]

*Criminal law—Complicity—Conspiracy—Aggravated murder—Sufficiency of the evidence—Court of appeals' judgment affirmed.*

(No. 2018-1116—Submitted December 10, 2019—Decided June 18, 2020.)

APPEAL from the Court of Appeals for Cuyahoga County,

No. 105570, 2018-Ohio-2067.

_____

**KENNEDY, J.**

{¶ 1} In this discretionary appeal from the Eighth District Court of Appeals, we are asked to determine whether there was sufficient evidence to support the convictions of the appellant, Sheila McFarland, on charges relating to the murder of Robert Williams. The Eighth District Court of Appeals held that there was sufficient evidence to support the convictions. We agree and therefore affirm the judgment of the appellate court.

## FACTUAL AND PROCEDURAL BACKGROUND

{¶ 2} Robert Williams was gunned down in the hallway outside his apartment on November 14, 2015. McFarland did not pull the trigger and was not at the scene of the murder. The issue in this case is whether there was sufficient evidence produced at trial to support the jury's verdicts that McFarland had conspired to murder Williams and had been complicit in the acts leading to his death.

{¶ 3} There is no dispute as to why Williams was killed and who killed him. Williams was a drug dealer whose cooperation with police had led to the arrest and jailing of his supplier, Eddie "Mann" Brownlee. McFarland was Brownlee's girlfriend, and she, too, had been arrested on drug charges due to Williams's cooperation with police. Ryan Motley, an associate of Brownlee, killed Williams, with encouragement from Brownlee to, at the very least, harm Williams. This case is about McFarland's involvement in the murder.

### The arrest of Brownlee and McFarland

{¶ 4} Williams was 64 years old at the time of his death and was living in Euclid with his girlfriend, Korri Henderson, in the Indian Hills Senior Community Apartments. He also sold drugs there. After police caught Williams drug dealing in and around the Indian Hills complex, they searched his apartment and recovered crack cocaine. They arrested both Williams and Henderson; the pair then agreed to become confidential informants against their supplier, Brownlee.

{¶ 5} Police used Williams to conduct three controlled drug buys from Brownlee. In two of those buys, Brownlee handled the transaction with Williams. In the third, the purchase was made from McFarland. Police arrested Brownlee and McFarland directly after the third transaction. Both were taken to the Euclid Police Department; McFarland was released, but Brownlee was kept in jail. It was October 25, 2015.

*Calls from jail*

**{¶ 6}** Brownlee and McFarland almost immediately suspected that it was Williams who was responsible for their arrests. Brownlee called McFarland numerous times from jail; those calls were recorded, and portions were later played to the jury. Brownlee called his own cellphone, which McFarland possessed. On Brownlee's first call to McFarland from jail, on October 25, 2015, McFarland suggested to Brownlee that it was Williams who had set him up, and Brownlee said that he was going to "get him." Motley, the eventual triggerman, was with McFarland when Brownlee called, and he also talked to Brownlee on that call. Brownlee told Motley, "I need you to handle this. * * * Get Rob." On that same call, Brownlee asked McFarland what had happened to his "hammer," in other words, his gun. She reported that Motley had retrieved it from the hotel room that she and Brownlee had been staying in and had then given it to Brownlee's brother, Chris. Motley testified that he got the gun back from Chris within two days of giving it to him and that that gun was the murder weapon.

**{¶ 7}** On subsequent calls from jail, Brownlee, incensed about his predicament, discussed his suspicions about Williams and Henderson working with police and McFarland agreed. He told McFarland that he was going to "beat [Williams's] ass," that he was going to "get him," and that Williams was not going to get away with what he had done. He asked McFarland whether Motley knew that Williams had been the informant. McFarland had talked to Motley about it, and McFarland reported to Brownlee that Motley said that Williams would "have to be handled." McFarland reported that many of their associates thought it was Williams who had informed on Brownlee and that "something got to be done." On another call, McFarland reported that she had talked to Williams and Henderson and they had denied setting up Brownlee, but McFarland said she knew the couple had been involved by the way they were acting. During a call just before Brownlee

was released, when the subject of Williams came up, McFarland urged Brownlee not to talk about it, saying, "You never know about this phone."

*McFarland's activities while Brownlee was jailed*

{¶ 8} McFarland maintained some contact with Williams and Henderson even after her arrest. On October 27, 2015, McFarland called Henderson from Brownlee's cellphone and left two messages in which she accused Henderson and Williams of working with detectives and being snitches. But she also met with Williams and Henderson and got a ride from them to the county jail to add money to Brownlee's commissary account.

{¶ 9} With Brownlee in jail, McFarland sought help from Motley; she suggested that they sell drugs together to raise money to post Brownlee's bond. McFarland saw Motley every day while Brownlee was in jail and together they raised money for Brownlee by selling drugs.

{¶ 10} Motley later testified at McFarland's trial; although he was the state's witness, the state confronted him at points with prior testimony and with a previous written statement he had prepared about the events concerning Williams's death. Motley testified that McFarland would vent to him about Brownlee being in jail. In discussions about the informants, McFarland told Motley that "they" needed to be "f[—-]ed up." And she communicated with Motley about the gun that would become the murder weapon.

*Events after Brownlee's release*

{¶ 11} On November 10, 2015, Brownlee was released from county jail. He and McFarland almost immediately went back to selling drugs together. On or around November 12, Brownlee and McFarland delivered crack to one of Brownlee's customers, Dwayne Jackson. Jackson testified that McFarland told him, "Watch out for Rob, they're snitching."

{¶ 12} Sometime between Brownlee's release from jail on November 10 and Williams's murder on November 14, Brownlee and Motley met in a hotel room

4

in Willoughby and discussed what to do about Williams; McFarland was also in the hotel room. Motley testified that Brownlee told him to "go rough the dude up, beat him up" and that Brownlee offered to pay Motley's accomplices.

{¶ 13} Henderson testified at McFarland's trial. She stated that the night before the murder, Williams received a threatening call from Brownlee saying that he was out of jail and would be coming for him and that Henderson and Williams were going to see their graves. According to Henderson, other threatening calls followed. A truck appeared at Williams's apartment complex that evening, and four people got out and started staring up at Williams's apartment window, where he was standing. Henderson called police to the apartment and filed a police report. After the police left, Henderson called a friend who also lived in the complex and she and Williams went there to stay until morning.

{¶ 14} In the early hours of November 14, while at the friend's apartment, Henderson got a call from McFarland. Henderson testified that the call came between 4:00 and 5:00 a.m., but telephone records revealed that no calls had come from Brownlee's phone after 3:11 a.m. Henderson told McFarland they had been getting threatening calls, and McFarland laughed it off. When Henderson told McFarland that the calls had come from Brownlee, McFarland denied Brownlee had made the calls and claimed she had been with him all night. Henderson testified:

> When she called, she just asked, she was like, How you-all doing? And I was like, What you mean? I'm like, How do you think we're doing? We've been getting threatening calls all night. And she was like, What you mean? And I was like, Mann [Brownlee's nickname] been calling Rob phone threatening us. And she was like saying what and whatever, and I was like talking about we going to die and he out of jail now, he coming to see us,

whatever, whatever.   And she was like, You sure that was Mann? And I said, Yeah, it was his phone.   I said, It came from you-all phone.  And she was like, He ain't made no calls like that.   But she was like, I've been with him the whole time.   And I said, Well, they came from you-all phone unless somebody else had you-all phone.

{¶ 15} Henderson testified that McFarland said she had to end the call because Brownlee was coming.  After that call, Henderson and Williams returned to their own apartment.  Henderson testified that they didn't sleep much and at around 10:00 a.m., Williams went out to take a walk down the hallway.

*The shooting*

{¶ 16} Williams was shot as he walked down the hallway outside his apartment.  Motley was the shooter.  He had two other people with him, his brother Raymond and another acquaintance, Rahkee Young.   All three snuck into the apartment complex and put on masks and gloves after they got inside.   Motley testified that he had placed tape over the door peepholes of the apartments near Williams's apartment (although DNA tests revealed his brother's DNA on the tape) so that those neighbors could not see what was going on in the hallway.  The three hid in the stairwell at the end of the hall behind a door.  Surveillance video shows that when Williams left his apartment and was walking down the hallway, Motley and Young emerged from behind the door and approached Williams.  Williams stopped and turned, and after a brief confrontation, Motley quickly fired one shot from close distance.  The three then fled.  Motley called Brownlee later that evening and told him, "It's done."

{¶ 17} Motley testified that later that night or the next day, Brownlee met him and paid him with drugs that were worth around $4,000 and that the three assailants, Brownlee, and McFarland met at a hotel.

{¶ 18} Henderson was able to identify Motley from the apartment building's surveillance footage. Henderson told a responding officer that she had been threatened by people she knew as Mann and Sheila and that she and Williams had been working with the narcotics department.

*Trial and appellate proceedings*

{¶ 19} Ryan Motley, Raymond Motley, Young, Brownlee, and McFarland were all indicted on ten counts, as follows: Count 1, aggravated murder under R.C. 2903.01(A) (committed with prior calculation and design); Count 2, aggravated murder under R.C. 2903.01(B) (committed in the course of committing felonious assault); Count 3, conspiracy to commit aggravated murder or murder under R.C. 2923.01(A)(1); Count 4, murder under R.C. 2903.02(B) (committed while committing aggravated burglary); Count 5, murder under R.C. 2903.02(B) (committed while committing felonious assault); Count 6, felonious assault under R.C. 2903.11(A)(1) (knowingly causing serious physical harm); Count 7, felonious assault under R.C. 2903.11(A)(2) (committed with a deadly weapon); Count 8, aggravated burglary under R.C. 2911.11(A)(1) (inflicted physical harm on the victim); Count 9, aggravated burglary under R.C. 2911.11(A)(2) (committed with a deadly weapon); and Count 10, kidnapping under R.C. 2905.01(A)(3). All ten counts included a firearm specification.

{¶ 20} McFarland's case was tried to a jury. At the conclusion of the state's case, McFarland's counsel moved for dismissal under Crim.R. 29, arguing that the state had failed to meet its burden to present sufficient evidence to establish the elements of the charges in the ten-count indictment. The trial judge denied the motion, and the jury found McFarland guilty on all ten counts. For purposes of sentencing, the trial court merged Counts 1, 2, 4, 5, 6, and 7 (the aggravated-murder, murder, and felonious-assault counts), Counts 8 and 9 (the aggravated-burglary counts), and all the gun specifications. The trial court sentenced McFarland to life in prison without the possibility of parole on Count 1, a concurrent 11 years on

Count 3, a concurrent 11 years on Count 8, and a concurrent 11 years on Count 10. The judge merged all the gun specifications and added three years to her sentence for the gun specification on Count 1, to be served prior to the life sentence, and a $20,000 fine on that count.

{¶ 21} McFarland appealed to the Eighth District Court of Appeals, and that court affirmed the convictions. In the appellate court, the state conceded that the kidnapping and aggravated murder convictions should have merged for sentencing. The court "remanded for resentencing for the sole purpose of merging the kidnapping count with the aggravated murder count and allowing the state to determine on which count to proceed to sentencing." *State v. McFarland*, 8th Dist. Cuyahoga No. 105570, 2018-Ohio-2067, ¶ 67. This court accepted one proposition of law for review: "A criminal defendant's constitutional rights are violated when she is found guilty based on insufficient evidence."

## LAW AND ANALYSIS

{¶ 22} McFarland's proposition of law is axiomatic—"a conviction based on legally insufficient evidence constitutes a denial of due process. *Tibbs v. Florida* (1982), 457 U.S. 31, 45, 102 S.Ct. 2211, 2220, 72 L.Ed.2d 652, 663, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560." *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997). Therefore, the question we face does not concern the *effect* of a conviction based upon insufficient evidence. Instead, we address a question appellate courts deal with regularly— whether the evidence was sufficient to support the jury verdicts in this case against this defendant. We conclude that the verdicts were based upon sufficient evidence.

### *Sufficiency of the evidence*

{¶ 23} McFarland argues that the evidence presented by the state was insufficient to support a conviction on any of the crimes with which she was charged. "Sufficiency of the evidence is the legal standard applied to determine whether the case may go to the jury or whether the evidence is legally sufficient as

a matter of law to support the jury verdict." *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). Retrial is barred if a reversal is based upon a finding that the evidence was legally insufficient to support the conviction. " 'A verdict of not guilty, whether rendered by the jury or directed by the trial judge, absolutely shields the defendant from retrial. A reversal based on the insufficiency of the evidence has the same effect because it means that no rational factfinder could have voted to convict the defendant.' " *Thompkins* at 387, quoting *Tibbs* at 41.

{¶ 24} This court has set forth the standard appellate courts should employ in reviewing the sufficiency of the evidence for a conviction:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (*Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), followed.)

*State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997). The trier of fact has the responsibility "fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson* at 319.

{¶ 25} The trial court sentenced McFarland on four counts only—Count 1 (aggravated murder committed with prior calculation and design), Count 3 (conspiracy to commit aggravated murder or murder), Count 8 (aggravated burglary while inflicting physical harm on the victim), and Count 10 (kidnapping), so we consider the sufficiency of the evidence on those convictions only.[1] *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 24 ("a 'conviction' consists of a guilty verdict *and* the imposition of a sentence or penalty" [emphasis sic]); S*tate v. Myers*, 154 Ohio St.3d 405, 2018-Ohio-1903, 114 N.E.3d 1138, ¶ 138 (merger of kidnapping count with aggravated-robbery and aggravated-burglary counts moots sufficiency-of-the-evidence claim regarding kidnapping count).

*Complicity*

{¶ 26} The major consideration in determining the sufficiency of the evidence in this case is not whether the individual crimes were committed but whether the evidence of McFarland's involvement in them was sufficient to find her guilty of the crimes. There is no suggestion that McFarland was present at the scene of the shooting. For the bulk of the charges, the central issue is whether the state proved that McFarland was complicit in the commission of the crimes. R.C. 2923.03 is Ohio's complicity statute. It states:

(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

(1) Solicit or procure another to commit the offense;

(2) Aid or abet another in committing the offense;

---

1. Pursuant to the judgment of the court of appeals, after remand to the trial court McFarland will be sentenced on only three counts due to the merger of the kidnapping and aggravated murder convictions. At this point, we do not know whether the state will choose sentencing for aggravated murder or kidnapping, so we review all four convictions for sufficiency.

(3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;

(4) Cause an innocent or irresponsible person to commit the offense.

**{¶ 27}** The statute does not define "aid or abet," but this court has stated that to aid or abet is " '[t]o assist or facilitate the commission of a crime, or to promote its accomplishment,' " *State v. Johnson*, 93 Ohio St.3d 240, 243, 754 N.E.2d 796 (2001), quoting Black's Law Dictionary 69 (7th Ed.Rev.1999).

**{¶ 28}** R.C. 2923.03(F) provides that anyone who violates the complicity statute "shall be prosecuted and punished as if he were a principal offender" and that an offender need not be charged under R.C. 2923.03, but instead may be charged with complicity in terms of the principal offense. Therefore, the state was not required to explicitly allege complicity. *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 32. McFarland was not charged with complicity under the statute but was charged with the principal offenses.

**{¶ 29}** "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." *Johnson* at syllabus. " 'Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.' " *Id.* at 245, quoting *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971). "The court must view the evidence in the light most favorable to the prosecution and defer to the trier of fact on questions of credibility and the weight assigned to the evidence. *State v. Fry,* 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 146." *State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 132.

{¶ 30} As explained in detail below, the evidence at trial was sufficient to prove that McFarland was complicit in the crimes associated with the killing of Williams.

*Aggravated murder*

{¶ 31} In Count 1, McFarland was charged with aggravated murder pursuant to R.C. 2903.01(A). Under that statute, "[n]o person shall purposely, and with prior calculation and design, cause the death of another." The element of prior calculation and design "require[s] a scheme designed to implement the calculated decision to kill." *State v. Cotton*, 56 Ohio St.2d 8, 11, 381 N.E.2d 190 (1978). The evidence was sufficient to support a conviction based on McFarland's participation and complicity in the scheme to kill Williams.

{¶ 32} McFarland was at the center of the series of events that led to the killing of Williams. From the spark of the idea that revenge would be had against Williams and Henderson in Brownlee's call from jail on October 25, to the telephone call she made to Henderson hours before the murder to assure Henderson that Brownlee was not threatening her and Williams, McFarland helped move the plan forward.

{¶ 33} In one of the first calls from jail, McFarland and Brownlee identified Williams as a snitch and Brownlee said that he was going to "get him." McFarland brought Motley in on the call. She made it clear that she had had prior conversations with Motley about the "hammer," the gun that Motley would eventually use to shoot Williams. Motley testified that he had received a text from McFarland regarding "their" gun, meaning Brownlee and McFarland's gun.

{¶ 34} While Brownlee was in jail, McFarland worked with Motley to sell drugs to finance Brownlee's bail. During her time with Motley, McFarland made clear to him that Williams and Henderson had to be dealt with. McFarland let the two know in a voicemail on October 27 that she considered them to be snitches. McFarland told Motley that they needed to be harmed. In another telephone call

with Brownlee, McFarland made clear to him that she had talked to Motley about what to do about Williams and Henderson and that Williams would "have to be handled." She had talked to other people about Williams and Henderson and told Brownlee that everybody knew about their role in McFarland's and Brownlee's arrests and that "something got to be done." In a November 9 telephone call closer to Brownlee's release from jail, she was more circumspect: after Brownlee said, "I could kick they ass," McFarland responded that they should not talk about it on the phone.

{¶ 35} Once Brownlee got out of jail, things moved quickly. McFarland was in the hotel room when Motley and Brownlee agreed that Motley would harm Williams. Although Motley testified that the plan was only to "rough up" Williams, the presence and quick use of the gun are evidence that murder was the plan, as was Brownlee's phone-call threat to Williams and Henderson that they were going to see their graves. The night before the murder, threatening phone calls—including the "see your graves" call—were made to Williams and four men arrived in the apartment parking lot in a truck and seemed to threaten Williams and Henderson. Williams and Henderson were frightened enough to stay with someone else in the apartment complex. In the early morning of November 14, hours before the murder, McFarland called Henderson and she attempted to assure her that it could not have been Brownlee making the calls, because she had been with him the entire night. A reasonable juror could determine from this evidence that McFarland was trying to minimize the imminent threat that Williams and Henderson faced. After the call, they did return to their own apartment.

{¶ 36} Later that morning, a planned attack was executed. At some point, tape was placed over Williams's neighbors' peepholes. Three people lay in wait in a stairwell until Williams emerged from his apartment. As Williams walked down the hallway outside his apartment, Motley and Young approached from behind. After Williams stopped and turned, there was a brief altercation before Motley fired

the gun. Less than ten seconds after Motley emerged from the stairwell, Williams was shot. Motley testified that he called Brownlee and told him, "It's done." Not that the plan had spun out of control or that there had been an accident; he merely reported, "It's done."

{¶ 37} When Motley and his associates met with Brownlee after the murder of Williams, McFarland was present again. In his testimony, Motley tried to diminish McFarland's involvement, and when faced with prior testimony or prior written statements, he tried to back off from those that implicated McFarland. For instance, regarding McFarland's statement that "they" needed to be "f[—-]ed up," Motley explained at trial that he understood that "they" really meant Henderson only, but the state pointed out that Motley had written "they" in his earlier statement. Motley also testified that he had been in contact with McFarland about the location of one of Brownlee's firearms; however, in his written statement, he had referred to it as one of "their" firearms. Motley eventually admitted in his trial testimony that he had received a text message from McFarland about "their" firearm. A juror could have easily interpreted parts of Motley's testimony as trying to save McFarland from prosecution. The jury "may believe or disbelieve any witness or accept part of what a witness says and reject the rest. In reaching its verdict, the jury should consider the demeanor of the witness and the manner in which he testifies, his connection or relationship with the prosecution or the defendant, and his interest, if any, in the outcome." *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶ 38} The meetings before and after the murder, the use of Brownlee and McFarland's gun, the lying in wait, the inclusion of Young and Raymond Motley as backup, the tape over peepholes, how quickly Motley fired the shot after emerging from the stairwell, and the phone call reporting, "It's done," all indicate prior calculation and design and that the assailants planned to cause the death of Williams.

{¶ 39} " 'Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed.' " *Johnson*, 93 Ohio St.3d at 245, 754 N.E.2d 796, quoting *Pruett*, 28 Ohio App.2d at 34, 273 N.E.2d 884. McFarland was a constant presence as Williams and Henderson were identified as targets and as it was decided that something had to be done. She discussed with Motley that Williams would "have to be handled" and incited him to harm the informants. She did not seek to have Motley return the murder weapon before the murder, advised Brownlee not to discuss Williams over the jail telephone, and was present at the planning meeting and the post-murder meeting. McFarland assisted in the plan by attempting to assuage Henderson's fears that she faced imminent danger from Brownlee. Finally, the drug-selling business she engaged in with Brownlee produced the payout to Motley.

{¶ 40} We determine that after viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that the essential elements of aggravated murder under R.C. 2903.01(A) had been proved beyond a reasonable doubt—McFarland purposely and with prior calculation and design caused the death of Williams or aided or abetted those who did by facilitating the commission of aggravated murder or by actively promoting it. She supported, assisted, encouraged, cooperated with, advised, and incited Brownlee and Motley in the planning and commission of the crime.

{¶ 41} A rational trier of fact could have also found McFarland guilty of aggravated murder through complicity by virtue of R.C. 2923.03(A)(1), by "solicit[ing] or procur[ing] another to commit the offense." During her time selling drugs with Motley while Brownlee was in jail, she discussed with Motley the role of Henderson and Williams in Brownlee's incarceration, and told him that "they" should be "f[—-]ed up." She told Brownlee that she had discussed the matter with Motley and that Motley said that Williams would "have to be handled." She never sought from Motley a return of the gun that she shared with Brownlee. She was

present when the planning meeting occurred and was present for the postmortem meeting.  A rational trier of fact could have found that through her complicity in soliciting Motley to commit aggravated murder, she was guilty of the purposeful killing of Williams with prior calculation and design.

{¶ 42} A rational trier of fact also could have found McFarland guilty of being complicit in aggravated murder through R.C. 2923.03(A)(3), which references the conspiracy statute, considering a person complicit who conspires with another to commit an offense in violation of R.C. 2923.01.  Since conspiracy is a separate count, we discuss it separately, below.

*Conspiracy*

{¶ 43} McFarland was charged with conspiracy to commit aggravated murder or murder under R.C. 2923.01.  The act of conspiring to commit a crime is a crime in and of itself; "it is no defense to a charge under this section that no offense that was the object of the conspiracy was committed." R.C. 2923.01(E).  The conspiracy statute provides:

(A) No person, with purpose to commit or to promote or to facilitate the commission of aggravated murder [or] murder, * * * shall do either of the following:

(1) With another person or persons, plan or aid in planning the commission of any of the specified offenses;

(2) Agree with another person or persons that one or more of them will engage in conduct that facilitates the commission of any of the specified offenses.

(B) No person shall be convicted of conspiracy unless a substantial overt act in furtherance of the conspiracy is alleged and proved to have been done by the accused or a person with whom the accused conspired, subsequent to the accused's entrance into the

16

conspiracy. For purposes of this section, an overt act is substantial when it is of a character that manifests a purpose on the part of the actor that the object of the conspiracy should be completed.

{¶ 44} Having determined above that the evidence was sufficient to prove that McFarland aided in planning or agreed that Motley would murder Williams, satisfying R.C. 2923.01(A), the key portion of the statute for purposes of this part of our analysis is R.C. 2923.01(B), the requirement of a substantial overt act in furtherance of the conspiracy. "An indictment for conspiracy * * * must allege some specific, substantial, overt act performed in furtherance of the conspiracy." *State v. Childs*, 88 Ohio St.3d 194, 724 N.E.2d 781 (2000), syllabus.

{¶ 45} The state alleged three overt acts in the indictment supporting the conspiracy count: (1) solicitation of Motley for murder, (2) providing or assisting Motley in procuring the firearm, and (3) threatening Williams and/or Henderson via a telecommunications system.

{¶ 46} As discussed above in regard to the first alleged overt act, a juror could reasonably find beyond a reasonable doubt that McFarland solicited Motley to commit murder. McFarland was the conduit for information between Brownlee and Motley, but she also was often with Motley while Brownlee was in jail, and when she and Motley were discussing Henderson and Williams she told him that they needed to be harmed. McFarland told Brownlee in one jail call that she had spoken with Motley and that Motley said that Williams "had to be handled." McFarland knew that Motley had the gun that belonged to her and Brownlee and texted Motley concerning its whereabouts. She was at the meeting in which the determination was made to harm Williams, and she was there when the assailants and Brownlee met after the killing. The fact that Brownlee solicited Motley for the murder does not mean that McFarland was not part of requesting and paying for Motley's murder of Williams.

**{¶ 47}** Regarding the second alleged overt act, there is sufficient evidence to demonstrate that McFarland provided or assisted Motley in procuring the gun. Motley referred to the murder weapon as "their" gun, meaning Brownlee and McFarland's gun. McFarland knew that Motley had retrieved the gun from the hotel Brownlee and McFarland had been staying in when they were arrested. Motley left it with Brownlee's brother, Chris, but retrieved it later. McFarland did not seek its return. There is no doubt that Brownlee and McFarland's gun was the murder weapon. A rational trier of fact, after viewing the evidence in a light most favorable to the prosecution, could have found that the essential elements of the conspiracy had been proved beyond a reasonable doubt, with the overt act being the provision of the gun to Motley.

**{¶ 48}** The third alleged overt act was proved beyond a reasonable doubt. At trial, evidence was introduced of voicemail messages left by McFarland on Henderson's phone after Brownlee's arrest. On the voicemails, McFarland can be heard cursing at Henderson, telling her she knew what Williams and Henderson had done and using an accusatory tone. McFarland's words were slurred, but the clear implication of the voicemails was that McFarland wanted to hold Williams and Henderson responsible for Brownlee's incarceration. She called them snitches. Given what was said and the circumstances surrounding the calls, there would be no reason for the voicemails other than to threaten Henderson and Williams. A reasonable juror could find that the voicemails were threatening. The calls "manifest[] a purpose on the part of the actor that the object of the conspiracy should be completed," R.C. 2923.01(B). The statute requires that the overt act occur after the accused entered into the conspiracy. The calls in question were placed in the early morning hours of October 27, 2015. A juror could conclude that the conspiracy was formed at the time of the October 25, 2015 jail call involving Brownlee, Motley, and McFarland, when they first identified Williams and Henderson as the people responsible for their arrests.

{¶ 49} A rational trier of fact, after viewing the evidence in a light most favorable to the prosecution, could have found that the essential elements of the conspiracy had been proved beyond a reasonable doubt, with the overt act being the provision of the threatening voicemails.

*The other charges*

{¶ 50} McFarland was convicted of aggravated burglary under R.C. 2911.11(A)(1), which provides:

> (A) No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply:
>
> (1) The offender inflicts, or attempts or threatens to inflict physical harm on another * * *.

A trespass under R.C. 2911.21(A) occurs when a person, without privilege to do so, "[k]nowingly enter[s] or remain[s] on the premises of another." It is no defense to a charge of trespass "that the land or premises involved was owned, controlled, or in custody of a public agency." R.C. 2911.21(B). There was sufficient evidence that McFarland violated R.C. 2911.11(A)(1) through her complicity with the Motley brothers and Young. Viewing the evidence in a light most favorable to the prosecution, a rational trier of fact could have found that the essential elements of aggravated burglary had been proved beyond a reasonable doubt—specifically, that through stealth or deception, the three assailants entered Williams's apartment building and put on masks and gloves in order to harm Williams and laid in wait

for him to emerge from his apartment, and when Williams did emerge, Motley inflicted physical harm on Williams. McFarland was complicit in the endeavor and therefore can be prosecuted under the aggravated-robbery statute even though she was not in the apartment building when the murder occurred.

{¶ 51} The remaining conviction was for kidnapping under R.C. 2905.01(A)(3), which states that "[n]o person by force [or] threat * * * shall * * * restrain the liberty of [another] person" for the purpose of "inflict[ing] serious physical harm on the victim." The jury had before it video surveillance footage from the hallway outside Williams's apartment. The footage reveals Williams walking down the hallway and Motley and Young emerging from behind the stairwell door. Williams turns to see them walking toward him. He stops, and there is a confrontation before the shooting. A reasonable juror could have determined that Williams's movements back toward his own apartment were restrained by either threat of force or use of force by Motley and Young, for the purpose of inflicting bodily harm upon Williams. Viewing the evidence in a light most favorable to the state, a rational trier of fact could have found that the evidence proved beyond a reasonable doubt that McFarland was guilty of committing kidnapping due to her complicity with Motley and Young.

## CONCLUSION

{¶ 52} Our duty in a sufficiency-of-the-evidence case is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found that the essential elements of the crime had been proved beyond a reasonable doubt. McFarland was a central figure in the killing of Robert Williams and a constant presence as Williams was targeted for revenge, as plans to kill him were made, and as the assailants met after his killing. She was in regular contact with Brownlee while he was in jail, reporting her suspicions about the role Williams and Henderson played in her and Brownlee's arrests. She told Brownlee that Motley and others she had talked to thought

20

something had to be done about Williams and Henderson. She was in frequent contact with Motley while Brownlee was in jail and knew that he had the gun she shared with Brownlee, which would become the murder weapon. When Brownlee got out of jail, she was present in the hotel room where the details of the plan against Williams were hatched. And hours before the murder, she called Henderson and attempted to mislead her about the imminent threat posed by Brownlee. After the deed was done, Brownlee paid off Motley in drugs that were the product of the criminal enterprise he participated in with McFarland, and McFarland was present again in the hotel room where all the participants in Williams's murder gathered after-the-fact.

{¶ 53} The record establishes that there was sufficient evidence on the four counts for which McFarland was sentenced—aggravated murder, conspiracy, aggravated burglary, and kidnapping—for a rational trier of fact to have determined that the elements of those crimes had been proved beyond a reasonable doubt. Accordingly, we affirm the judgment of the court of appeals.

Judgment affirmed.

DEWINE, J., concurs.

DORRIAN, J., concurs as to the convictions for aggravated murder, aggravated burglary, and kidnapping.

O'CONNOR, C.J., and FRENCH and FISCHER, JJ., concur in judgment only.

DONNELLY, J., dissents, with an opinion joined as to the conspiracy conviction by DORRIAN, J.

JULIA L. DORRIAN, J., of the Tenth District Court of Appeals, sitting for STEWART, J.

———————————

**DONNELLY, J., dissenting.**

{¶ 54} When the United States Supreme Court set forth the sufficiency-of-the-evidence analysis requiring reviewing courts to view the evidence "in the light

most favorable to the prosecution" when determining whether the evidence presented is legally sufficient to support the conviction, *Jackson v. Virginia*, 443 U.S. 307, 318-319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), I do not believe the court meant a searchlight should be used to uphold a criminal conviction. Yet, despite the lead opinion's attempt to find evidence to sustain appellant Sheila McFarland's convictions, they have come up empty-handed. For the reasons that follow, I respectfully dissent.

**TRIAL EVIDENCE**

**{¶ 55}** The lead opinion acknowledges that McFarland was not present when Robert Williams was shot and killed as he exited his apartment on November 14, 2015. It nevertheless maintains that there was sufficient evidence to support her convictions for conspiracy to commit murder and complicity in the associated crimes. To support affirming these convictions, the lead opinion relies on particular pieces of the state's evidence while disregarding the uncontroverted testimony of the state's key witness. As I explain below, I do not believe that the evidence establishes that McFarland had any participatory role in the crimes unquestionably perpetrated by Eddie Brownlee, Ryan Motley, and Motley's accomplices.

**{¶ 56}** I will start with the evidence that the lead opinion barely acknowledges: the trial testimony of Ryan Motley. As the lead opinion notes, Motley, known also by the nickname "Chop," went to Williams's apartment building with two confederates on the morning of November 14, 2015, and shot Williams in the hallway of his apartment complex. Motley was indicted on all the same charges that were brought against the other defendants, including McFarland.

**{¶ 57}** Rather than face trial, however, Motley agreed on October 5, 2016, to plead guilty to amended Count 1, which reduced the charge of aggravated murder to murder, with the three-year gun specification for that charge retained, and Count 3, which charged conspiracy to commit murder, with the three-year gun specification for that charge deleted; all remaining counts were dismissed. Further,

22

Motley was immediately required to give a proffer statement in which he detailed what his testimony would be at the trials of Brownlee and McFarland. If Motley's testimony was not truthful and was not consistent with other known facts, the state reserved the right to rescind the plea agreement and prosecute Motley on the offenses as charged. Motley thereafter entered guilty pleas as described and was sentenced to serve 18 years to life in prison.

{¶ 58} Immediately after accepting Motley's guilty pleas, the trial court asked Motley what happened on November 14, 2015. In open court, Motley admitted that he had approached Williams with his gun drawn and had shot Williams as Williams appeared to be reaching for the gun. Motley disclosed that Brownlee told him to "rough [Williams] up" because of Williams's role in Brownlee's then-recent arrest on drug charges. Motley acknowledged that he had initially obtained the gun from a hotel room that Brownlee had occupied, although Brownlee was not present at the time.

{¶ 59} Motley stated in his proffer that McFarland did not play any role in Motley's retrieval of "the hammer," i.e., the gun. Motley stated that he did not talk to McFarland about roughing up Williams or getting the gun. Motley said he had no contact with McFarland prior to the commission of the November 14, 2015 crimes.

{¶ 60} Brownlee was convicted in October 2016 on all but Counts 1, 7, and 9. When McFarland's case came on for jury trial in February 2017, Motley was called as a state's witness and admitted to his role in murdering Robert Williams. Motley testified that the day after Brownlee and McFarland's October 25, 2015 arrest on drug charges, he went without their knowledge to the Willoughby, Ohio, hotel that Brownlee had occupied in order to remove any drug-related evidence before the police discovered it, so as to protect Brownlee and McFarland from additional charges. Motley did not find any drugs but did find a gun under the mattress. Motley took the gun from the hotel and gave it to Brownlee's brother,

but he retrieved it from him 48 hours later and thereafter kept it until the day of the murder.

{¶ 61} Motley testified that following Brownlee's release from jail on November 10, 2015, and prior to the November 14, 2015 shooting, he and Brownlee met at the Willoughby hotel and Brownlee told him what he wanted him to do. Motley described the hotel room as being a suite that had a living area, a kitchen area, a bedroom, and a bathroom. Motley testified that McFarland was not in the area where the conversation between Brownlee and Motley occurred but instead was in a different part of the hotel room.

{¶ 62} Motley testified that it was his decision to go to Williams's apartment complex on the morning of November 14, 2015, with the gun. Later that day, Motley told Brownlee, "It's done." At some point on the evening of the murder or the next day, Motley met with Brownlee at the Willoughby hotel, while McFarland was in the hotel suite's bedroom with the door closed. Brownlee gave Motley drugs valued at approximately $4,000 as an apparent reward.

{¶ 63} Motley testified that he acted at only Brownlee's direction. He testified that McFarland did not play any role in the plan to retaliate against Williams. And he testified that McFarland did not play any role in his obtaining possession of the gun that he used to kill Williams.

{¶ 64} I note here that despite having expressly reserved the right to rescind Motley's plea agreement if his testimony was not truthful or consistent with other known facts, the state of Ohio did not rescind the plea agreement after Motley provided his proffer statement and trial testimony.

{¶ 65} Given that Motley's testimony appears to exculpate McFarland from the charges brought against her in this case, the lead opinion looks to other evidence that supposedly establishes McFarland's complicity and conspiratorial involvement in these crimes. But even that other evidence does not demonstrate McFarland's participation in the charged crimes.

{¶ 66} In particular, the lead opinion relies on portions of the October 25, 2015 jail call from Brownlee to McFarland in which they discussed their belief that Williams was a snitch and Brownlee ranted that he was going to "get him." That hardly establishes McFarland's complicity or conspiratorial involvement in plans to commit murder.

{¶ 67} The lead opinion says that during that same call, "McFarland brought Motley in on the call." Lead opinion at ¶ 33. Specifically, the evidence reflects that McFarland received the call while she was with Motley as a passenger in his truck. After Brownlee learned that McFarland was with Motley, McFarland handed the phone to Motley, at which time Brownlee told Motley, "Chop, I need you to handle this." Motley replied, "I already know." Brownlee added, "Chop, get [Williams], get those mother fuckers." When their private conversation was concluded, Motley handed the phone back to McFarland. There is no evidence that McFarland heard anything that Brownlee said to Motley.

{¶ 68} Later in that same call, Brownlee asked McFarland about "the hammer." McFarland told Brownlee that Motley had already retrieved the gun and had given it to Brownlee's brother. From this evidence, the lead opinion says that McFarland "made it clear that she had had prior conversations with Motley" about the gun. Lead opinion at ¶ 33. So what? Does an inquiry concerning the whereabouts of a gun establish a conspiracy or complicity to commit murder? I would not have thought so before today's decision.

{¶ 69} Toward the end of that same call, Brownlee told McFarland: "Tell Chop when I get out I'm going to handle this." Taken at face value, the implication was that no one should do anything until Brownlee was released from jail—at which time Brownlee, perhaps with Motley's assistance, intended to handle the matter himself. That hardly inculpates McFarland in conspiracy or complicity to commit murder.

**{¶ 70}** The lead opinion gives undue if not talismanic significance to the fact that Motley, in the seven-page statement he wrote on October 16, 2015, referred to the gun as "their" gun. His trial testimony sought to correct that statement to reflect that the gun in fact was "his," i.e., Brownlee's, gun and not "their" gun. In any case, is the offhand use of a personal pronoun in an unsworn witness statement—with no showing of foundational knowledge to even make such a declaration—conclusive proof of conspiracy or complicity to commit murder?

**{¶ 71}** The lead opinion says that while McFarland worked with Motley to sell drugs to finance Brownlee's bail, "McFarland made clear to [Motley] that Williams and Henderson had to be dealt with." Lead opinion at ¶ 34.[2] Regardless of whether McFarland was angry with Williams and Henderson, the lead opinion cannot point to any evidence indicating that she acted on that anger to cause harm to them. Motley flatly stated that he did not talk to McFarland about roughing up anyone and that she did not play any role in the planning of the events that occurred on November 14, 2015.

**{¶ 72}** The lead opinion further relies on a jail call between Brownlee and McFarland in which McFarland said that Motley had said that Williams would "have to be handled." Putting hearsay analysis aside, I fail to see how that statement could inculpate McFarland in conspiracy and complicity to commit murder. The evidence was that *Motley* was the one who said that they would "have to be handled" and that McFarland merely relayed what Motley said to Brownlee. Nor do I interpret McFarland's passive submission to Brownlee's voluble rantings as some form of silent incitement or encouragement to act.

**{¶ 73}** Noting that "things moved quickly" once Brownlee was released from jail on November 10, 2015, the lead opinion says, "McFarland was in the hotel

---

2. The lead opinion makes repeated references to McFarland's involvement in drug dealings but neglects to acknowledge that McFarland was acquitted of all charges she faced in the drug trafficking case. *See State v. McFarland*, Cuyahoga C.P. No. CR-15-601477-B (May 22, 2017).

room when Motley and Brownlee agreed that Motley would harm Williams." Lead opinion at ¶ 35. But as noted previously, Motley testified that the hotel room was a suite with different areas and that McFarland was not in the area where Brownlee and Motley had their conversation. In any case, proximity is not necessarily equal to presence.

{¶ 74} There was no evidence to suggest that McFarland had any knowledge of Brownlee's November 13, 2015 calls to Williams stating that Brownlee was out of jail and would be coming for Williams and Henderson and that they were going to "see their graves." Henderson testified that McFarland was not one of the four unidentified people who stood by their truck in the apartment's parking lot looking up at Williams' window as he started cussing them out.

{¶ 75} Henderson testified that she received a telephone call from McFarland early on the morning of November 14, 2015, inquiring how they were doing. Henderson testified that McFarland had denied that Brownlee had made any threatening calls to Henderson and Williams but that McFarland had ended the call when she saw Brownlee approaching. There is no evidence that either Brownlee or Motley were aware of McFarland's call to Henderson or that it had any effect on Motley's actions. To infer that that phone call proves McFarland's complicity in the murder scheme requires pure speculation and conjecture. I fail to see how this evidence substantiates McFarland's supposed involvement when no other evidence establishes her participatory role in any plan.

{¶ 76} As to the facts of the actual killing on November 14, 2015, the lead opinion does not identify any evidence that shows McFarland's involvement in the crime.

{¶ 77} With regard to what it calls the postmortem meeting at the Willoughby hotel, the lead opinion says "McFarland was present again," lead opinion at ¶ 37; however, the lead opinion once again ignores Motley's uncontroverted testimony that McFarland was in a different area—behind a closed

bedroom door—while Brownlee and Motley completed their business. Indeed, the lead opinion takes liberties with the record when it describes a meeting with all the confederates taking place after the murder. In truth, the testimony on this was ambiguous at best. What is not ambiguous, however, is that the state's star witness once again exculpated McFarland. While Motley was being questioned about previous testimony elicited during a prior trial, the following exchange occurred:

> Q: All right. And do you remember testifying about the meeting where you met with Mr. Brownlee and Miss McFarland after the murder?
>
> A: Can you repeat the question?
>
> Q: Do you remember the meeting with Mr. Brownlee and Miss McFarland after the murder?
>
> A: Do I remember talking to them?
>
> Q: Well, do you remember that meeting, first of all?
>
> A: Yes.
>
> Q: And was Eddie Brownlee and Sheila McFarland both present?
>
> A: When I had the meeting?
>
> Q: Yes.
>
> A: See, that's why I want you to be more specific, because you're saying having a meeting, like me and everybody is in here right now, we're talking, everybody can hear, it's basically like we're having a meeting. So basically I'm talking to you and I'm talking to everybody else in the courtroom. If she's behind that door right there, I don't know if she can hear me or not. So she's not present to the meeting.

Q: Well, how about this. Why don't you tell me what you meant by this testimony:

\* \* \*

Question: "Okay. And who was there when you met up with him now the second time after the hotel room?"

Your answer was: "Who was with him?"

Question: "Right. Who was with him."

Answer: "Sheila."

Question: "All right. Him and Sheila in tandem. And who was with you?"

Answer: "The same two parties, Rahkee and my brother Raymond."

Okay, Is that all true or not?

A: Yes. But you're still missing what I'm trying to say. She can be there, but listening to the conversation is different.

Motley appears fixated on clarifying that McFarland was not present. No follow-up clarifying questions were asked about the meeting or, in particular, the presence of the other assailants. So regardless of what Motley said about the accomplices' presence in prior testimony—for which we have no context or understanding of the line of questioning—his testimony in McFarland's trial did not expressly say that they were present at a meeting after the murder.

{¶ 78} The lead opinion says this was sufficient evidence to convict McFarland of aggravated murder based on her aiding or abetting another in committing the offense, R.C. 2923.03(A)(2), or soliciting or procuring another to commit the offense, R.C. 2923.03(A)(1). I cannot agree.

{¶ 79} The lead opinion says McFarland "incited [Motley] to harm the informants." Lead opinion at ¶ 39. How? I do not see how McFarland did anything

to cause Williams's murder, either by aiding or abetting or by soliciting or procuring.

{¶ 80} The lead opinion says McFarland did not ask Motley to return the gun to her before the murder. Is that now proof of conspiracy and complicity to commit murder?

{¶ 81} The lead opinion says McFarland discouraged the irate Brownlee from discussing Williams on the jail telephone. Is that also proof of conspiracy and complicity to commit murder?

{¶ 82} Faced with Motley's uncontroverted trial testimony that McFarland had no involvement whatsoever in the plan of retaliation that Brownlee directed Motley to execute against Williams, the lead opinion says that the jury could disbelieve his testimony and conclude that McFarland was involved. But under *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668 (1997), an appellate court's duty is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *Id*. at paragraph two of the syllabus. Today's lead opinion turns *Jenks* on its head by determining whether the evidence *if disbelieved*, would convince the average mind of the defendant's guilt beyond a reasonable doubt.

{¶ 83} In my view, there must first be evidence to substantiate the elements of the offense before adverse inferences can be drawn from other evidence. Here, the evidence utterly failed to establish McFarland's participatory role in the crimes committed against Williams. Indeed, as to the specific charge of conspiracy, the evidence failed to show any overt act by McFarland to promote or facilitate the commission of aggravated murder or murder.

**CONCLUSION**

**{¶ 84}** It is surprising to me that this court accepted discretionary jurisdiction in this case only to end up affirming McFarland's conviction. This case presents no novel issue of law. We are not establishing new law or resolving conflicts in old law. Instead, the lead opinion acknowledges that the question here is one routinely addressed by appellate courts across the state. In that respect, this case is unremarkable.

**{¶ 85}** At the same time, I do believe that the case presents an issue of great public interest that the lead opinion ignores. Contrary to the lead opinion's assertion that "the question we face does not concern the *effect* of a conviction based upon insufficient evidence," (emphasis sic) lead opinion at ¶ 22, I do not see how we can justly ignore the effect of such a conviction here—a sentence of life in prison without the possibility of parole.

**{¶ 86}** This is a serious case involving the death of a man and the just punishment of those responsible for the crime. The significant issues presented concern the proper use of circumstantial evidence and the reasonable inferences that can be drawn from the testimony of witnesses in order to determine whether the evidence is legally sufficient to obtain a conviction such that its corresponding sentence is commensurate with the defendant's criminal culpability for the crime.

**{¶ 87}** The legitimacy of the administration of criminal justice is under scrutiny now perhaps more than ever. I believe that some of the biggest threats to the public's confidence in the justice system are wrongful convictions, disparate treatment, and sentences that are inconsistent with criminal culpability.

**{¶ 88}** McFarland, believing there was no compelling evidence that supported the state's indictments, chose to exercise her constitutional right to trial. Despite a paucity of evidence, McFarland was convicted. By exercising her constitutional right to trial, McFarland turned down a plea agreement that could have resulted in a three-year prison sentence. While the jury was deliberating, the

state again offered McFarland a plea deal, which she also turned down. In my experience, this is a highly unusual step for the state to take after a case has been submitted to the jury. After her convictions, she ended up with the most severe sentence short of the death penalty, while the individual who actually pulled the trigger and killed the victim in this case has the opportunity to be released in 18 years.

{¶ 89} At sentencing the trial court stated:

And when there was a plea bargain offer just before trial, you rejected it. When there was a plea bargain offer when the jury was deliberating you rejected it because, apparently, your attorneys told me that you, quote, made your peace with God, closed quote. Well, now you have to make your peace with the state of Ohio. Okay?

The court proceeded to sentence her to a life sentence without the possibility of parole.

{¶ 90} Sheila McFarland chose to place her trust in the criminal justice system, and it failed her, allowing a conviction to stand based not on evidence but on innuendo, speculation, and conjecture. This court—provided with a final opportunity to remedy this injustice—perpetuates the failure. I dissent.

DORRIAN, J., concurs in the foregoing opinion as to the conspiracy conviction.

_____

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Daniel T. Van and Callista Plemel, Assistant Prosecuting Attorneys, for appellee.

Mark A. Stanton, Cuyahoga County Public Defender, and Jeffrey M. Gamso and Paul Kuzmins, Assistant Public Defenders, for appellant.

_____