[Cite as *State v. Parks*, 2023-Ohio-4316.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                                    :

    Plaintiff-Appellee,                    :

    v.                                              :

TYRON PARKS,                                     :

    Defendant-Appellant.              :

No. 112596

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 30, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-672082-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Nora Bryan, Assistant Prosecuting Attorney, *for appellee.*

Cullen Sweeney, Cuyahoga County Public Defender, and Michael V. Wilhelm, Assistant Public Defender, *for appellant.*

MARY J. BOYLE, J.:

{¶ 1} Defendant-appellant, Tyron Parks ("Parks"), challenges his domestic violence and child endangering convictions and raises the following three assignments of error for review:

**Assignment of Error I:** [Plaintiff-appellee, the state of Ohio,] did not meet its burden of production as to Count 2 and presented insufficient evidence of [Parks's] guilt.

**Assignment of Error II:** [Parks's] conviction was against the manifest weight of the evidence as he merely engaged in reasonable parental discipline.

**Assignment of Error III:** The [s]tate did not meet its burden as to Count 3 and presented insufficient evidence of [Parks's] guilt.

{¶ 2} For the reasons set forth below, we affirm Parks's convictions.

## I. Facts and Procedural History

{¶ 3} In August 2022, Parks was charged in a three-count indictment involving his stepson, J.H. (d.o.b. 11/22/14.) Count 1 charged him with domestic violence and carried a furthermore clause indicating that Parks had previously pled guilty or was convicted of three offenses of domestic violence. Each of Counts 2 and 3 charged him with child endangering. Each of Counts 1-3 were charged as third-degree felonies. The matter proceeded to a bench trial in February 2023, where the following evidence was adduced.

{¶ 4} J.H., who was eight years old at the time of trial, testified that he was currently living with his grandmother, grandfather, and uncle. In May 2022, which was at the time of the incident, J.H. lived with his mother, S.H., his three siblings, and Parks, his stepfather. He testified that when he was in kindergarten, Parks hit him in the leg with a belt. J.H. testified that it hurt, but it did not hurt badly, and that he felt bad about getting hit. J.H. recalled talking to his school principal and the police about his injury and going to the doctor. On cross-examination, J.H. testified that Parks hit him with a belt because his friends thought he said a curse

word, "but [he] didn't, and that's why [he] got in trouble." (Tr. 28.) J.H. explained, "[M]y friends told on me because I called them a trash can, and they called me a horse." (Tr. 28.)

{¶ 5} Gwen Abraham ("Abraham"), who was the principal of J.H.'s school in May 2022, testified that one of her morning duties was to help the children exit their cars. She described J.H., who was in kindergarten, as "a very lovable boy. * * * [H]e was one of those little guys that would jump out of car and you'd get your morning hug. Very sweet personality, very gentle-natured, lots of hugs. Definitely a hard-working very, very sweet, loving type of little boy." (Tr. 33.) Abraham testified that at no point throughout the entire school year was J.H. identified as a problem in any capacity.

{¶ 6} On May 3, 2022, Parks dropped off J.H. at school in the morning. As J.H. exited the vehicle, Abraham noticed that "he was limping, walking extremely slowly, grimacing. And he looked very distressed[.]" (Tr. 35.) Abraham approached J.H., who was in tears, and was having extreme difficulty walking. They walked to the office, where Abraham asked J.H. what was wrong. J.H. replied that "he hurt," so Abraham took him to the school's clinic. (Tr. 36.) Abraham learned from J.H. "that his dad beat him." (Tr. 36.)

{¶ 7} Abraham then had the school social worker come into the office with her and she asked J.H. what hurt. J.H. said "that his legs, his arms, his foot." (Tr. 37.) She testified that J.H.

had huge bruises. He's a small child; he had bruises on his legs. They were like lines about that wide consistent with maybe getting belted. He said that he got whooped. He had several bruises like that. He had bruises that were the outline of handprints * * * and fingerprints on his hands. * * * You know, * * * it looked like handprints on his skin and very purple, very mean-looking bruises.

(Tr. 37-38.)

{¶ 8} Abraham then testified that, in her capacity as principal, she has dealt with issues like this before and she is "a mandated reporter, so when these kinds of situations occur [she] take[s] down information and [she] follow[s] our procedures of making the appropriate reports to Children and Family Services." (Tr. 38.) When asked what concerned her the most regarding J.H.'s injuries, Abraham replied, "I truly had never seen so many bruises on a child before. And * * * he was clearly in pain; he was limping terribly. * * * I've never had that severe of an injury on a child before." (Tr. 39.) Because of these observations, Abraham followed her protocol and contacted Children and Family Services and the Garfield Heights school resource officer. Abraham testified that this was the first time where she had to call the school resource officer for suspected child abuse.

{¶ 9} Garfield Heights Police Officer Brittany Crespo ("Officer Crespo") testified that on May 3, 2022, she responded to a call at Elmwood Elementary for child endangering. Officer Crespo first spoke with school staff who reported that J.H. "was whooped by his stepdad, and that he was limping because he was hurt." (Tr. 78.) Officer Crespo escorted J.H. out of his classroom and down the hall. Officer

Crespo testified that when J.H. came out of the classroom, she "saw him limping down the hallway." (Tr. 78.)

{¶ 10} Officer Crespo wore a body camera at the time and the video footage was played for the court. In the video, J.H. can be observed limping. J.H. stated to Officer Crespo that he was hit multiple times with a belt and indicated to Officer Crespo where he was hit. Officer Crespo had him pull down his jeans and she was able to see marks on his legs and above his shoulder. J.H. is seen removing his bandage and showing officers an injury to his foot. It was Officer Crespo's understanding that this injury was sustained during the beating J.H. received from Parks. J.H. indicated to her that Parks used a "metal pole" or "rod" to inflict the injury to his foot. (Tr. 83.) Officer Crespo then described the injuries depicted in the photos she took of J.H.'s injuries. There was a marking to J.H's pelvic area that "was very red," "redness and some bruising" to J.H.'s right calf, " a long scratch [and] bruising" to J.H.'s right thigh, "redness" or "bruising" to his left shoulder, and "redness and some bruising" to his left thigh. (Tr. 84-86.)

{¶ 11} After documenting J.H.'s injuries, Officer Crespo called Children and Family Services and called EMS to determine if there were other internal injuries that they could not observe. EMS transported J.H. to Marymount Hospital, which ended Officer Crespo's involvement, and the case was turned over to the detective.

{¶ 12} On cross-examination, defense counsel confirmed with Officer Crespo that J.H. also had told her that he was hit with a metal rod by his brother. On redirect, the state confirmed with Officer Crespo that at no point in her

interactions with J.H. did she observe the injuries to his upper body to be caused by the metal rod. The only injury related to the metal rod was to his foot. On recross-examination, defense counsel confirmed that Officer Crespo heard J.H. tell her that "two different people had hit him with a metal rod." (Tr. 99.)

{¶ 13} Catherine Dull ("Dull"), a forensic nurse with the Cleveland Clinic Forensic Nursing Program, testified that she sees patients of all ages who have been through sexual assault, domestic violence, elder abuse, child abuse, and trauma. In May 2022, Dull was still training in the program and observed Kayla Galton, a forensic nurse, perform a forensic exam on J.H. He told the nurse that Parks "'whooped me with a belt.'" (Tr. 57.) When asked how, J.H. replied, Parks "'used a belt and tied my hands to a metal rail.'" (Tr. 57.) When asked if Parks has done this before, J.H. replied, Parks "'has hit me before but not like that.'" (Tr. 58.)

{¶ 14} Dull testified that pictures were also taken of any injuries as part of J.H.'s exam and a body map was completed, indicating the following five areas of injury to J.H.:

> "1, [Right] posterior thigh approximately 5-by-2 centimeter cluster of bruises;
>
> 2, [Right] lateral leg abrasion 0.5-by-5 centimeter;
>
> 3, [Left] lateral leg approximately 16-by-8 centimeter cluster of bruises;
>
> 4, [Right] thigh approximately 12-by-10 centimeter cluster of bruises;
>
> 5, [Left] lateral thigh approximately 8-by-12 centimeter cluster of bruises."

(Tr. 66.)

{¶ 15} Parks testified on his own behalf. He confirmed that he has been previously convicted of multiple charges of domestic violence concerning an ex-girlfriend. He further confirmed that one of those convictions was a felony and the others were dropped to misdemeanor assaults. Parks testified that J.H. stopped living with him after "the whooping that took place." (Tr. 116.) When asked what he meant by "whooping," Parks clarified that he meant "disciplining." (Tr. 116.) Parks disciplined J.H. before by other means such as taking away television privileges, making him write assignments, and taking away outside privileges. When asked what sort of behaviors J.H. was exhibiting to warrant these punishments, he stated:

> Well, [J.H.], he was going to school * * * he showed his butt. He gripped his private area. He put a pillow on my * * * nine month[ ] old at the time * * *. And he was caught doing like moaning noises in class and stuff like that.

(Tr. 117.)

{¶ 16} Parks testified that J.H.'s teacher notified him and S.H. about some behavioral issues at school. He tried to meet with the principal about it "but she brushed [Parks] off multiple times, [him] and [his] wife." (Tr. 119.) Parks testified that this occurred in April 2022 and J.H.'s behavior was getting worse. When asked what lead to the "whooping" on the date in question, Parks testified:

> So when I pulled up to the school, I was in the line. When I approached [J.H.] to get him in the car, the teacher looked ticked off and she came up to the car. She usually opens the door for him and get him in, and I seen that she was upset * * * [b]ecause [J.H.] said some inappropriate things on the playground to some other kids.

(Tr. 121-122.) The teacher told Parks that she was "tired of this; he's getting worser." (Tr. 123.) To which Parks replied, "I will handle it. I will talk to him." (Tr. 123.)

{¶ 17} Parks testified that when they returned home, he talked to J.H. about what happened on the playground that day. J.H. indicated to him that "he was being bullied and * * * a kid made him say it." (Tr. 125.) Parks took him in the room and explained, "[J.H.], dad loves you. But I cannot no longer allow you to keep going to school acting out." (Tr. 126.) He then talked to J.H. for approximately five to seven more minutes, and that's when he proceeded to discipline J.H. He resorted to corporal punishment because J.H.'s behavior was escalating. Parks testified that he told J.H. "to lean on the bed." (Tr. 127.) Then Parks took his belt and whooped J.H. Parks stated that he did not "whoop [J.H.] repeatedly, [he] didn't go crazy and didn't go in." (Tr. 127.) He further testified that he used one of his belts that was at least 40 inches and he struck J.H. from a distance. He did not fold the belt in half when striking J.H. Parks struck J.H. "about four to five times" and admitted to hitting him "hard." (Tr. 129.) Parks testified that his intent was to teach J.H. the difference between right and wrong and correct his behavior.

{¶ 18} Parks further testified that he did not observe J.H. limping after the incident. The next day, he drove J.H. to school and did not observe any limping or signs of injuries. S.H. then received a call from the school and told him that J.H. had bruises on his body. Because of this, Children and Family Services came to the house and J.H. was taken from S.H.'s custody and placed with his grandmother. Parks also spoke with the detective assigned to the case. Parks testified that was not

worried about speaking with the police because he felt that he did the right thing and was not worried about being accused of abuse. If given the opportunity, Parks testified that he would like to reunify with J.H. and "get the whole family back together." (Tr. 138.) He also testified that he took parenting classes with The Nurturing Parenting Program.

{¶ 19} On cross-examination, Parks testified that the school principal was not aware of any of the behavioral incidents that J.H.'s teacher discussed with him. The state then asked Parks if the injuries were an accident or mistake. Parks responded:

> I wouldn't call it a mistake, I wouldn't call it an accident. I'm owning up to what I have done. I didn't know at that moment of me disciplining my child that I was hitting too hard or hitting too less. I thought I was doing the right thing. There's no handbook on how to discipline your kid or how to handle problems. I'm a first-time dad. I've been in his life since 2019.

(Tr. 144-145.) Parks then confirmed that at the time of this incident he was about 230 pounds and stood 5′9″ tall. J.H. weighed 53 pounds.

{¶ 20} Following the conclusion of trial, the court found Parks guilty of all three counts and sentenced Parks to nine months in prison on each count, with the counts to be served concurrently to each other. The court also sentenced Parks to up to two years of postrelease control, gave Parks 26 days of jail-time credit, and waived costs, fines, and fees. Parks now appeals his convictions.

## II. Law and Analysis

### A. Sufficiency of the Evidence

{¶ 21} In the first and third assignments of error, Parks challenges his child endangering convictions as charged in Counts 2 and 3, arguing that there is insufficient evidence to sustain his convictions.

### 1. Standard of Review

{¶ 22} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. An appellate court's function when reviewing sufficiency is to determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 23} With a sufficiency inquiry, an appellate court does not review whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A sufficiency of the evidence argument is not a factual determination, but a question of law. *Thompkins* at 386.

{¶ 24} In *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, the Ohio Supreme Court cautioned:

But it is worth remembering what is not part of the court's role when conducting a sufficiency review. It falls to the trier of fact to "'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" [*State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 24], quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Thus, an appellate court's role is limited. It does not ask whether the evidence should be believed or assess the evidence's "credibility or effect in inducing belief." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541. Instead, it asks whether the evidence against a defendant, if believed, supports the conviction. *Thompkins* at 390 (Cook, J., concurring).

*Id.* at ¶ 16.

## 2. Count 2 – R.C. 2919.22(B)(3)

{¶ 25} Parks first argues the state did not meet its burden as to child endangering as set forth in R.C. 2919.22(B)(3), which provides that "[n]o person shall do any of the following to a child under eighteen years of age * * * [a]dminister corporal punishment or other physical disciplinary measure, or physically restrain the child in a cruel manner or for a prolonged period, which punishment, discipline, or restraint is excessive under the circumstances and creates a substantial risk of serious physical harm to the child[.]" We note that the culpable mental state for endangering children is recklessness. *State v. Adams*, 62 Ohio St.2d 151, 153, 404 N.E.2d 144 (1980). A person acts reckless when

with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

R.C. 2901.22(C).

{¶ 26} Parks does not dispute that he administered corporal punishment. Rather, Parks contends that the state failed to prove that he created a "substantial risk of serious physical harm." "Substantial risk" means "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8). "Serious physical harm" is defined under R.C. 2901.01(B)(5) as any of the following:

> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
>
> * * *
>
> (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

{¶ 27} Parks, relying on this court's decision in *State v. Crenshaw*, 8th Dist. Cuyahoga No. 108830, 2020-Ohio-4922, argues that bruising on a child's leg is not considered serious physical harm. And, while there may have been some risk of a more serious internal injury, "some risk does not equate to a substantial risk."

{¶ 28} In *Crenshaw*, Crenshaw hit her nine-year old daughter, D.T., in the head with a kitchen spoon, pushed her head into a wall, and struck her legs with an extension cord three times for using Crenshaw's hair dye to make slime and accidentally spilling the slime in the bathroom without cleaning it up. D.T. sustained multiple bruises on her upper right arm and both legs and had a bruise and a five centimeter bump on her forehead. The emergency room doctor did not observe any signs of head trauma and did not believe it was necessary to order any tests. The

doctor gave D.T. Tylenol to help with pain. Crenshaw was convicted of felony domestic violence and two counts of felony child endangering.

{¶ 29} On appeal, Crenshaw argued that the state did not present sufficient evidence to prove D.T. suffered serious physical harm. We agreed, finding that while D.T. suffered bruising and a bump on her head, this court did not seek to minimize the pain that D.T. suffered, and "the fact remains that her injuries only amounted to bruising and a bump." *Id.* at ¶ 50. We further found that the bruising and the bump on D.T.'s head were not evidence of a substantial risk of a serious head injury because "the doctor did not perform a concussion test or order any other imaging test; she did not believe it was necessary to test for head trauma." *Id.* at ¶ 55.

{¶ 30} The state argues that *State v. Miller*, 8th Dist. Cuyahoga No. 111785, 2023-Ohio-1141, is more analogous to the instant case. There, Miller repeatedly struck his 17 year-old daughter H.M. with an extension cord after he had learned that she lied to him about spending time with a boy. H.M.'s legs were so bruised and swollen that she could not wear shorts for a month and had difficulty sitting down. She had "very dark bruises all the way down * * * her butt and legs." *Id.* at ¶ 37. Miller admitted that he went "overboard" by "whipping" H.M. until she "broke down" and told him the truth. *Id.* Miller further admitted that he had left markings on her and "was not proud of his conduct." Miller was convicted of two counts of felony child endangering.

{¶ 31} On appeal, he argued that his convictions were not supported by sufficient evidence. We noted that

R.C. 2919.22(B)(3) does not require the state to prove that the child suffered serious physical harm. Instead, the statute requires the state to prove that the conduct at issue created "a substantial risk of serious physical harm to the child." Thus, to obtain a conviction [under R.C. 2919.22(B)(3)], the state was not required to prove that Miller's conduct in fact caused the child to suffer serious physical harm, but only to show that Miller's conduct created a substantial risk of serious physical harm. *In re Kristen V.*, 6th Dist. Ottawa No. OT-07-031, 2008-Ohio-2994, ¶ 69 (stating that "R.C. 2919.22(B)(3) requires only that the corporal punishment create a substantial risk, or strong possibility," of serious physical harm); *State v. Sarver*, 7th Dist. Columbiana No. 5-CO-53, 2007-Ohio-601, ¶ 49; *State v. Harris*, 8th Dist. Cuyahoga No. 78241, 2001 Ohio App. LEXIS 2562 (June 7, 2001) (stating that "the jury's finding that [defendant] committed the offense of endangering children is not inconsistent with its further finding that [defendant] did not cause serious physical harm to [the child].").

*Id.* at ¶ 34.

{¶ 32} We found that when viewing the evidence in a light most favorable to the state, the jury could have reasonably concluded that Miller's discipline of H.M. was "violent, unreasonable, and excessive, in that Miller created a substantial risk of serious physical harm to H.M. by disregarding the unjustifiable risk associated with striking a teenage girl repeatedly with an extension cord." *Id.* at ¶ 38, citing *State v. Jackson*, 8th Dist. Cuyahoga No. 82724, 2004-Ohio-2332; *State v. Burdine-Justice*, 125 Ohio App.3d 707, 715, 709 N.E.2d 551 (12th Dist.1998); *State v. Sommerfeld*, 8th Dist. Cuyahoga No. 84154, 2004-Ohio-6101, ¶ 34 (The "correction of the victim's behavior under the circumstances presented did not require the severity of the beatings inflicted upon her by appellant.").

{¶ 33} We agree with the state and find *Miller* more persuasive. The state was not required to prove that J.H. actually suffered serious physical harm. *Miller*,

8th Dist. Cuyahoga No. 111785, 2023-Ohio-1141 at ¶ 34; *Sarver*, 7th Dist. Columbiana No. 5-CO-53, 2007-Ohio-601 at ¶ 49. Rather, under R.C. 2919.22(B)(3), the state was only required to prove that Parks's conduct created "a substantial risk of serious physical harm" to J.H., and when viewing the evidence in a light most favorable to the state, we conclude that a rational trier of fact could have found the elements of R.C. 2919.22(B)(3) proven beyond a reasonable doubt. *Id.* In finding so, we acknowledge that the "creating a substantial risk of serious physical harm" analysis is necessarily a case-by-case, fact-based analysis.

{¶ 34} Here, the evidence at trial revealed that Parks weighed about 230 pounds at the time of the beating while J.H., a seven-year-old boy, weighed about 53 pounds. Parks was upset with J.H. for saying curse words at school. Parks admitted to laying J.H. on the bed and striking him "four to five times" with a belt more than 40 inches long. According to J.H., Parks tied his hands to a metal rail. Parks admitted to "hitting [J.H.] hard." These four to five belt lashes caused J.H. so much bruising and pain that his principal observed him limping as he exited the car at school the next morning. He was "walking extremely slowly" and "grimacing" and was "in tears." Abraham described his injuries as "huge bruises." "They were like lines about that wide consistent with maybe getting belted. He said that he got whooped. He had several bruises like that. He had bruises that were the outline of handprints * * * and fingerprints on his hands. * * * You know, * * * it looked like handprints on his skin and very purple, very mean-looking bruises." (Tr. 37-38.)

Abraham was concerned about J.H.'s injuries because she "truly had never seen so many bruises on a child before. And * * * he was clearly in pain; he was limping terribly." (Tr. 39.) Officer Crespo's bodycam video, which was played for the court, depicts J.H. limping as he was walking in the school hallway. After observing J.H.'s injuries, school officials and Officer Crespo decided to transport J.H. to the hospital for an examination and to rule out potential internal injuries. The medical examination revealed that J.H. had five different injury sites with three bruises on his right leg and two bruises on his left leg ranging from .5-by-5 centimeters to 16-by-8 centimeters.

{¶ 35} The trial court captured the magnitude of the offenses at sentencing when it said:

> You grabbed a belt. You were 200 — you might be close to 300 pounds. You grabbed a belt. That kid is six, seven years old at the time. He doesn't weigh 40 pounds.
>
> * * *
>
> I think the prosecutor is 100 percent right. You seem to have a lack of understanding as to what was going on here. Whatever was in your heart may have been in your heart but your actions to a — this kid is so tiny. I wish the record could see how small this little guy is. And I saw the injuries. I saw what you did to him. Where your heart might be, that's not the Court's issue.

(Tr. 173, 177.)

{¶ 36} In light of the foregoing, any rational trier of fact could have reasonably concluded that Parks's discipline of J.H. was excessive and that he acted with heedless indifference by creating a substantial risk of serious physical harm to J.H. when he repeatedly struck a seven-year old, 53 pound boy with a belt and

caused extensive bruising.  Parks bound J.H.'s hands to a metal rail and struck him with a belt because J.H. called some friends "trash can" on the playground.  *See Miller*, 8th Dist. Cuyahoga No.  111785, 2023-Ohio-1141 at ¶ 38; *Sommerfeld*, 8th Dist. Cuyahoga No. 84154, 2004-Ohio-6101 at ¶ 33-34.

### 3.  Count 3 — R.C. 2919.22(B)(4)

{¶ 37} Parks next argues that the State did not meet its burden of production as to child endangering as set forth in R.C. 2919.22(B)(4), which provides that

> No person shall do any of the following to a child under eighteen years of age * * *:
>
> * * *
>
> (4) Repeatedly administer unwarranted disciplinary measures to the child, when there is a substantial risk that such conduct, if continued, will seriously impair or retard the child's mental health or development[.]

{¶ 38} Parks contends that "[t]here is no indication that [he] harmed J.H. in such a way that his mental health or development will be seriously impaired or halted.  There cannot be a 'substantial risk' of serious impairment * * * of a child's development where the state has not been able to show that the harm done extends into something more severe."  Minimizing the extent of the harm, however, does not change the fact that when the evidence is viewed in a light most favorable to the state, the evidence supports the conviction.

{¶ 39} In this case, J.H. indicated to Parks that he was being bullied at school and Parks's solution was to repeatedly strike J.H. with his belt, who was seven-years old and  53 pounds at the time.  The lashes were so forceful that J.H. could not walk

into school the next day without crying, limping, and grimacing in pain. After the police came to school, J.H. had to go to the hospital and get an abuse exam. He was then taken away from his mother's custody and placed with his grandmother. In light of the foregoing, we find that the state has met its burden and the evidence supports that Parks repeatedly administered unwarranted disciplinary measures, which caused a substantial risk that impaired J.H.'s mental health and development.

{¶ 40} Therefore, the first and third assignments of error are overruled.

**B. Manifest Weight of the Evidence**

{¶ 41} In the second assignment of error, Parks argues that his convictions are against the manifest weight of the evidence because he engaged in reasonable parental discipline. We note that this assertion of "parental discipline" is an affirmative defense, and is properly reviewed under a manifest weight challenge. *Westlake v. Y.O.*, 8th Dist. Cuyahoga No. 107226, 2019-Ohio-2432, ¶ 17, 23.

**1. Standard of Review**

{¶ 42} When reviewing a manifest weight challenge, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Virostek*, 8th Dist. Cuyahoga No. 110592, 2022-Ohio-1397, ¶ 54, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "'only in the exceptional

case in which the evidence weighs heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541 quoting *Martin* at 175.

{¶ 43} As this court has previously stated:

> The criminal manifest weight-of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541 (1997). Under the manifest weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's? *Wilson* at *id*. Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 2000-Ohio-276, 723 N.E.2d 1054 (2000).
>
> When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Wilson* at *id*., quoting *Thompkins* at *id*.

*State v. Williams*, 8th Dist. Cuyahoga No. 108275, 2020-Ohio-269, ¶ 86-87.

## 2. Reasonable Physical Discipline

{¶ 44} "Proper and reasonable parental discipline can be an affirmative defense to a charge of domestic violence." *Y.O.* at ¶ 23, citing *State v. Hart*, 110 Ohio App.3d 250, 254, 673 N.E.2d 992 (3d Dist.1996). In *State v. Suchomski*, 58 Ohio St.3d 74, 567 N.E.2d 1304 (1991), the Ohio Supreme Court found that parents have the right to use reasonable physical discipline, or corporal punishment, to prevent and punish a child's misconduct as long as the discipline is proper and reasonable under the circumstances. *Id.* at 75. "'Proper' and 'reasonable' have been respectively defined as 'suitable or appropriate' and 'not extreme or excessive.'" *Y.O.* at ¶ 23, quoting *State v. Hicks*, 88 Ohio App.3d 515, 520, 624 N.E.2d 332 (10th Dist.1993).

{¶ 45} "'The propriety and reasonableness of corporal punishment in each case must be judged in light of the totality of the circumstances. A child's age, behavior, and response to noncorporal punishment as well as the location and severity of the punishment are factors that should be examined.'" *Y.O.* at ¶ 29, quoting *State v. Hart*, 110 Ohio App.3d 250, 256, 673 N.E.2d 992 (3d Dist.1996). "[T]he parent's state of mind while administering the discipline" has also been added to the list. *Id.*, citing *Galion v. Martin*, 3d Dist. Crawford No. 3-91-6, 1991 Ohio App. LEXIS 6092 (Dec. 12, 1991) (striking a child in anger is not the same as disciplining an unruly child). *See also State v. Ford*, 8th Dist. Cuyahoga No. 109087, 2020-Ohio-4298, ¶ 28.

{¶ 46} Parks contends that J.H.'s teacher complained to him about J.H.'s behavior, which ultimately resulted in him using corporal punishment. However, none of the testimony presented at trial corroborated Parks's claim that his conversations with J.H.'s teacher even occurred or that J.H. had any disciplinary behavioral issues at school. Rather, Abraham testified that J.H. was a "loving type of little boy" with a "very sweet personality." (Tr. 33.) Abraham also testified that at no point throughout the entire school year was J.H. identified as a problem in any capacity.

{¶ 47} Parks also contends that he has tried several other means of discipline outside of corporal punishment that did not work, such as taking away television and outdoor privileges. But, he also admitted that he used corporal punishment like this in the past: "I didn't always go in to just give him a whooping; I'll talk to him

and, you know, I pull him to the side and we have scripture and I talk with him." (Tr. 121.) Parks further testified that when he confronted J.H. about what the teacher had allegedly told him, J.H., who was in kindergarten at that time, shared that he was being bullied. J.H. stated that he called his friends a "trash can, and they called [him] a horse." (Tr. 28.) Parks testified that he believed J.H. was being bullied. Nevertheless, Parks then took J.H. to the bedroom where he struck him with a belt four to five times. We cannot say the trial court "lost its way" in finding that Parks's punishment was extreme or excessive under these circumstances. Moreover, the evidence at trial revealed that Parks has a criminal history of using violence against others who are physically weaker than him. Parks has been convicted of domestic violence against his ex-girlfriend on three separate occasions. In light of the foregoing, we find Parks's defense that his parental discipline was reasonable and proper unpersuasive. Parks's domestic violence conviction is not against the manifest weight of the evidence.

{¶ 48} Accordingly, the second assignment of error is overruled.

## III. Conclusion

{¶ 49} Parks's convictions are supported by sufficient evidence and are not against the manifest weight of the evidence. The trial court could have reasonably concluded that Parks's discipline of J.H. was unreasonable and excessive and that he created a substantial risk of serious physical harm to J.H. by disregarding the unjustifiable risk associated with striking a seven-year old boy repeatedly with a belt and causing extensive bruising and impairing J.H.'s mental health and

development. We also find that Parks's parental discipline was unreasonable and improper in light of the totality of the circumstances.

{¶ 50} Judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

ANITA LASTER MAYS, A.J., and
KATHLEEN ANN KEOUGH, J., CONCUR