[Cite as *State v. Coleman*, 2024-Ohio-5320.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO, :

    Plaintiff-Appellee, :

                        No. 113541

    v. :

CHRIS ELMO COLEMAN, :

    Defendant-Appellant. :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 7, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-683051-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Dominic Neville, Assistant Prosecuting Attorney, *for appellee*.

Patituce & Associates, LLC, and Megan M. Patituce, and Joseph C. Patituce, *for appellant*.

MARY J. BOYLE, J.:

{¶ 1} Defendant-appellant, Chris Elmo Coleman ("Coleman"), appeals his felonious assault convictions. He raises two assignments of error for review:

**Assignment of Error I:** The State failed to present sufficient evidence to prove [Coleman's] guilt beyond a reasonable doubt.

**Assignment of Error II:** [Coleman's] convictions were against the manifest weight of the evidence.

{¶ 2} For the reasons set forth below, we affirm Coleman's convictions.

## I. Facts and Procedural History

{¶ 3} The instant appeal arises from the shooting of Deandre Hoffman ("Hoffman") in the Carver Park Estates in Cleveland. There was no eyewitness testimony regarding the shooting presented at trial. Rather, the State presented the sequence of events through video and the testimony of the investigating officers and forensic experts. As a result of the shooting, Coleman was charged in July 2023, with two counts of felonious assault (R.C. 2903.11(A)(1) and (2)). Each count included both a one- and three-year firearm specification. The matter proceeded to a bench trial in November 2023, at which the following evidence was adduced.

{¶ 4} Cleveland Metropolitan Housing Authority Police Officer Tyler Sayre ("Officer Sayre") first testified that he heard numerous gunshots while patrolling the Carver Park area, on May 16, 2022, and observed individuals carrying a male, who was later identified as Hoffman, into the back of a vehicle. The vehicle then sped off. Officer Sayre caught up to the vehicle and as he approached, "the driver poked his head out and said there's a male shot and they were going to Metro." (Tr. 24.) Officer Sayre replied that he would follow them and updated his supervisor of the situation. Once they arrived at MetroHealth Hospital ("Metro"), Officer Sayer assisted the two males who were in the vehicle as they unloaded Hoffman from the back of the vehicle. At that point, Officer Sayre observed that Hoffman had two

gunshot wounds — one to the right leg and one to the right foot. Hoffman initially identified himself to Officer Sayre as "Robert Howard." (Tr. 27.) Officer Sayre testified he later learned that "Robert Howard" was actually Hoffman. Police did not have a suspect after speaking with Hoffman.

{¶ 5} A few hours later, Officer Sayre spoke with Coleman, who was also at Metro. Coleman told Officer Sayre that he was in the Carver Park area and was shot in the back. Coleman told Officer Sayre that he did not know who shot him. Coleman was in that area because his brother was shot there two days prior and murdered. Officer Sayre testified that he activated his body camera and his interaction with Coleman was captured on video, which was played for the court and corroborated his testimony.

{¶ 6} Officer Sayre further testified that he went back to the area where he observed Hoffman being loaded into the vehicle and "located a blood trail which [he] continued to follow into the parking lot of 4908 Central where [he] located a firearm between two vehicles." (Tr. 33-34.) Officer Sayre identified the firearm as a "Glock 23 chambered in 40 caliber." (Tr. 35.) He continued to follow the trail and ended up walking in the Carver Park courtyard where he found "[f]ive spent 40 calibers along with two spent 45 calibers." (Tr. 36.) Officer Sayre's findings were also recorded by his body camera and played for the trial court.

{¶ 7} Cleveland Metropolitan Housing Authority Police Sergeant Detective Ashley Jaycox ("Sgt. Jaycox") testified that she investigated the incident. She determined that "Robert Howard" was a fake name because during the investigation

of another case, she learned that "Drizzie" was involved in the May 16th shooting. Sgt. Jaycox testified she knew "Drizzie" as Hoffman from working in the neighborhood for over "the last nine and a half years" and as the result of approximately 20 run-ins with "Drizzie." (Tr. 108.) Sgt. Jaycox was able to identify Hoffman from Officer Sayre's body cam footage at Metro.

{¶ 8} Sgt. Jaycox further testified that she reviewed the surveillance footage of the Carver Park area before walking the area. While canvassing the area, she took a swab of blood on a fence because she observed a person falling against it in the surveillance video. The blood was later determined to be Coleman's. Sgt. Jaycox also recovered two .40 caliber casings and two .45 caliber casings from the scene. Sgt. Jaycox testified to the belongings she recovered from Coleman at the hospital. Those belongings included a black Adidas shirt, a black Adidas jacket with white stripes, and green gloves. A 9 mm magazine with 13 rounds was also found in Coleman's jacket.[1] Sgt. Jaycox submitted the jacket for gunshot residue testing.

{¶ 9} Sgt. Jaycox also testified about the videos she obtained regarding the shooting. Sgt. Jaycox confirmed that the clothes worn in the videos by both Coleman and Hoffman matched the clothes they were wearing at Metro. In the first video, a vehicle can be observed doing laps around the Carver Park Estates from approximately 8:54 p.m. to 8:57 p.m. Then, Coleman, who was in the rear passenger seat on the driver's side, and two other individuals exited this vehicle. The three of

---

[1] On cross-examination, Det. Jaycox testified she believed that Coleman had "a lawful carrying license." (Tr. 163.)

them were all wearing masks. Coleman had his hands in his jacket pockets and the driver of the vehicle was carrying a firearm. State's exhibit No. 35, another video, depicts the shooting. In this video, a group of five individuals, including Coleman, can be observed stopping to talk in the courtyard near a brick maintenance building. Coleman then walked away from this group and proceeded to walk behind the brick building. He is out of the camera's view at this point. Almost immediately after Coleman left the camera's view, Hoffman emerged from behind the same brick building.

{¶ 10} As Hoffman comes into view, one of the four remaining individuals in view, who was never identified, raised his arm and fired a gun in Hoffman and Coleman's direction. Hoffman can be observed immediately falling to the ground and the unknown shooter ran away, along with the three other males. While Hoffman is on the ground, he can be observed shooting his gun in Coleman's direction who then reappeared into view and fell down to the ground leaning against a pillar with his arm extended. Sgt. Jaycox testified, "[A]t this point the only two that we can assume that are shooting are [Coleman] and [Hoffman.]" (Tr. 135.) Hoffman then got up and ran away. Moments later Coleman got up and ran away in the opposite direction. As he was running away, Coleman can be observed extending his arm with a gun in his hand and pointing back into Hoffman's direction. Coleman can then be observed getting back into the vehicle with the unknown shooter and driving away at a high rate of speed.

{¶ 11} Video footage from another camera view in State's exhibit No. 35 depicts Hoffman riding his bike through trails in the courtyard heading toward the back of the brick maintenance building. Coleman can be observed walking past Hoffman as Hoffman approached the back of the building on his bike. At that point, Hoffman fell off his bicycle. Coleman also fell to the ground, but then got up and ran out of the camera's view. Sgt. Jaycox believed that the .40 caliber firearm recovered by Officer Sayre belonged to Hoffman. Sgt. Jaycox was not able to determine the identity of the unknown individual observed in the video shooting in Hoffman and Coleman's direction.

{¶ 12} Because there was no surveillance footage of a gun in Coleman's hand at the moment Hoffman was shot, defense counsel questioned Sgt. Jaycox on cross-examination about whether Coleman shot Hoffman. They had the following exchange:

> [DEFENSE COUNSEL]: I mean, is there a way that you can show me where you see a gun in my client's hand?
>
> [SGT. JAYCOX]: When he is running that way.
>
> [DEFENSE COUNSEL]: But that's after. That's not here. We don't see a gun in his hand at the moment, either at the moment that [Hoffman] falls down or at the moment that somebody else is shooting at both of them?
>
> [SGT. JAYCOX]: No. Because they're in his pockets before he goes around that building.
>
> [DEFENSE COUNSEL]: And are you asserting that he shot the gun through his pocket?

[SGT. JAYCOX]: No. I'm asserting when he went around the building he pulled out the gun, shot [Hoffman], Hoffman falls and the other shooter then starts shooting.

(Tr. 176-177.)

{¶ 13} Curtiss Jones ("Jones"), supervisor of the trace evidence unit of the Cuyahoga County Regional Forensic Science Laboratory testified that he tested Hoffman's jacket and Coleman's jacket and shirt. Hoffman's jacket tested positive for gunshot residue on the sleeves and sleeve cuffs. Jones testified that a "positive result" is "an indication that that person potentially while wearing that garment fired a weapon, they were in close proximity to a weapon at the time it was fired, or there was transfer of residue secondarily from some other surface to whatever the sample the sleeve cuffs of the jacket." (Tr. 72.) Coleman's jacket sleeves and sleeve cuffs also tested positive for gunshot residue. Additionally, Coleman's jacket had damage to it that Jones described as the "appearance of a bullet hole" to the "lower center back." (Tr. 74, 86.) According to Jones, this area tested negative for fouling, powder grains, and nitrites and wipe off rim residue, which helps determine if the bullet hole was an entrance versus an exit wound. Jones testified that testing of this bullet hole, in the absence of any gunshot residue, and without knowing for certain if the wound underlying the bullet hole is an entrance or exit, indicates "either a distant shot or an exit [wound]." (Tr. 76.) If Jones had information that the bullet hole was an entrance wound, then he would be able to conclude that "it was a distant muzzle to target distance." (Tr. 76.) Jones further testified that gunshot residue "[e]xpelled from the end of barrel of the weapon [is] going to have the same energy that the

other residue particles have to the powder grains and fouling, so it's going to travel in that same range that those particulates would be found at," which "could be anywhere out to five feet or so." (Tr. 73.) As to the three conclusions for a "positive gunshot residue result" (fired a weapon, in close proximity, or transfer), Jones could not provide an opinion as to how exactly the residue came to be on either Hoffman's or Coleman's jacket.[2]

{¶ 14} Following the conclusion of trial, the court found Coleman guilty of both felonious assault counts along with the accompanying one- and three-year firearm specifications. In December 2023, the court held the sentencing hearing and imposed the following:

> [A] prison sentence at the Lorain Correctional Institution of 8 year(s). One and three year firearm specifications in both counts merge into 3 year firearm specifications in each count. Count One and Count Two merge for the purpose of sentencing and State elects to proceed on Count 1. The 3 year firearm specifications in each count do no[t] merge by law. Thus, the two 3 year firearm specifications shall run consecutive to each other, for a total of 6 years of firearm specifications, to run prior to and consecutive to the underlying offense, to which he is sentenced to a minimum of 2 years and a maximum of 3 years, for a total of a minimum of 8 years and a maximum of 9 years.

(Journal Entry, Dec. 13, 2023.) The court also notified Coleman that he is subject to a mandatory minimum of 18 months up to a maximum of 3 year of postrelease control, gave Coleman two days of jail-time credit, and waived costs.

---

[2] On cross-examination, Sgt. Jaycox testified that the police sent the case through for Hoffman's shooting of Coleman, but "I don't know the outcome. I know [Hoffman] took a plea, if I'm not mistaken." (Tr. 168.)

**{¶ 15}** It is from this order that Coleman appeals, raising two assignments of error for review.

## II. Law and Analysis

### A. Sufficiency of the Evidence

**{¶ 16}** In the first assignment of error, Coleman challenges his felonious assault convictions by arguing that the State failed to present sufficient evidence of his guilt beyond a reasonable doubt.

**{¶ 17}** We note that the test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 2009-Ohio-3598, ¶ 12 (8th Dist.). An appellate court's function when reviewing sufficiency is to determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

**{¶ 18}** With a sufficiency inquiry, an appellate court does not review whether the State's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). A sufficiency of the evidence argument is not a factual determination, but a question of law. *Thompkins* at 386.

{¶ 19} In *State v. Jones*, 2021-Ohio-3311, the Ohio Supreme Court cautioned:

> But it is worth remembering what is not part of the court's role when conducting a sufficiency review. It falls to the trier of fact to "'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" [*State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 24], quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Thus, an appellate court's role is limited. It does not ask whether the evidence should be believed or assess the evidence's "credibility or effect in inducing belief." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541. Instead, it asks whether the evidence against a defendant, if believed, supports the conviction. *Thompkins* at 390 (Cook, J., concurring).

*Id.* at ¶ 16.

{¶ 20} "'When evaluating the sufficiency of the evidence to prove the elements, it must be remembered that circumstantial evidence has the same probative value as direct evidence.'" *State v. Garcia*, 2022-Ohio-3426, ¶ 32 (8th Dist.), quoting *State v. Palmer*, 2021-Ohio-4639, ¶ 45 (7th Dist.), citing *Jenks*, 61 Ohio St.3d at 272-273.

{¶ 21} Here, Coleman was convicted of felonious assault in violation of R.C. 2903.11(A)(1) and (2). The relevant provisions of the statute provide as follows:

(A) No person shall knowing do either of the following:

(1) Cause serious physical harm to another . . .;

(2) Cause or attempt to cause physical harm to another . . . by means of a deadly weapon . . . .

R.C. 2903.11(A)(1) and (2). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or

will probably be of a certain nature." R.C. 2901.22(B). "In other words, a defendant acts knowingly when, although not necessarily intending a particular result, he or she is aware that the result will probably occur." *State v. Lloyd*, 2021-Ohio-1808, ¶ 50 (8th Dist.).

{¶ 22} Coleman's argument is two-fold. First, he argues that the State failed to prove that he was the individual who actually shot Hoffman. Next, he argues that if it were to be believed that he shot Hoffman, the State failed to prove that he acted knowingly. We find Coleman's arguments unpersuasive.

{¶ 23} Here, State's exhibit No. 35 contains video evidence of Coleman in a car driving slowly up and down Carver Park Estates and eventually parking the car in the area Hoffman was approaching. Coleman then exits that vehicle with the unknown shooter and one other individual, approaching the courtyard with masks on in daylight in the middle of May. Coleman can be observed walking right next to Hoffman behind the brick building, and then Hoffman immediately falls off his bike and onto the ground. At the same time, an unknown male can be observed shooting his gun in Hoffman and Coleman's direction. Hoffman, who was shot in his leg and foot, is on the ground and can be observed shooting his gun in Coleman's direction who then fell to the ground and was shot in the back, leaning against a pillar with his arm extended. Hoffman gets up and runs away. Moments later, Coleman also gets up and as he was running away, he could be observed turning around and pointing a firearm at Hoffman. He then reentered the vehicle with the unknown shooter and drove away.

{¶ 24} The forensic evidence revealed gunshot residue on his sleeves, which indicated that he was close enough to a gun that when it fired, that residue transferred to the jacket and shirt he was wearing. Additionally, the bullet hole on the lower back area of Coleman's jacket tested negative for any residue, which indicated that the muzzle-to-target distance was greater than five feet. Because only Coleman's jacket and shirt sleeves tested positive for gunshot residue, the trier of fact was able to conclude that this gunshot residue was present because he shot a firearm. The trier of fact was also able to conclude that Coleman was shot because the gunshot residue test on his jacket would have also revealed powder grain and fouling, which it did not. When viewing the foregoing evidence in a light most favorable to the State, we find sufficient evidence to prove that Coleman knowingly caused serious physical harm to Hoffman and caused or attempted to cause physical harm to Hoffman when Coleman fired his gun at him.

{¶ 25} Alternatively, the State contends, and we agree, that the court could have found Coleman guilty under the theory that he was complicit with the individual who was observed on video shooting at Hoffman. At trial, the State argued in its opening statement, rebuttal to Coleman's Crim.R. 29 motion, and closing argument that Coleman shot at Hoffman, and, at a minimum, he was complicit in the shooting because he came with two unknown individuals who were also involved in the shooting.

{¶ 26} R.C. 2923.03(A)(2) provides that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall . . . [a]id or abet

another in committing the offense[.]"  To support a conviction for complicity by aiding and abetting, "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.  Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240 (2001), paragraph one of the syllabus. R.C. 2923.03(F) provides that an individual "guilty of complicity in the commission of an offense, . . . shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense."  From this, the Ohio Supreme Court has concluded:

> Thus, a defendant charged with an offense may be convicted of that offense upon proof that he was complicit in its commission, even though the indictment is "stated * * * in terms of the principal offense" and does not mention complicity.  R.C. 2923.03(F) adequately notifies defendants that the jury may be instructed on complicity, even when the charge is drawn in terms of the principal offense.  *See State v. Keenan* (1998), 81 Ohio St.3d 133, 151, 689 N.E.2d 929, 946, citing *Hill v. Perini* (C.A.6, 1986), 788 F.2d 406, 407-408.

*State v. Herring*, 94 Ohio St.3d 246, 251 (2002); *see also State v. Johnson*, 2003-Ohio-3241, ¶ 49 (8th Dist.) ("Where one is charged in terms of the principal offense, he is on notice, by operation of R.C. 2923.03(F), that evidence could be presented that the defendant was either a principal or an aider and abettor for that offense.")[3]

---

[3] We note that the matter before us was tried before the bench and not the jury; therefore, no jury instructions were given.  This distinction, however, does not change the analysis.

{¶ 27} In the instant case, the video evidence depicts Coleman in a car driving around Carver Park, exiting that vehicle with the unknown shooter and one other individual, all wearing face masks, and approaching the courtyard. Coleman can be observed walking right next to Hoffman, who then immediately falls off his bike and onto the ground. At the same time, the unknown male can be observed shooting his gun in Hoffman's direction. As Coleman ran away, he could be observed turning around and pointing a firearm at Hoffman. He then reentered the vehicle with the unknown shooter and drove away. This evidence is sufficient to prove that Coleman supported, assisted, encouraged, cooperated with, advised, or incited the unknown shooter who can be observed on video shooting at Hoffman.

{¶ 28} We note that in a bench trial "'the trial court is entitled to the presumption of regularity, that is, the trial court is presumed to know and follow the law in arriving at its judgment unless it affirmatively appears to the contrary.'" *State v. Kennedy*, 2024-Ohio-1586, ¶ 50 (8th Dist.), quoting *State v. Shropshire*, 2016-Ohio-7224, ¶ 37 (8th Dist.), citing *State v. Eley*, 1996-Ohio-323, citing *State v. Post*, 32 Ohio St.3d 380 (1987). Indeed, "the trial judge is presumed to know the law and to consider only the relevant, material, and competent evidence in arriving at a decision." *State v. Primous*, 2020-Ohio-912, ¶ 60 (8th Dist.), citing *State v. Bays*, 87 Ohio St.3d 15 (1999). Therefore, when viewing the foregoing evidence in a light most favorable to the State, the trial court could have found, beyond a reasonable doubt, that Coleman was complicit in the shooting.

{¶ 29} Accordingly, we find sufficient evidence to sustain Coleman's convictions, and the first assignment of error is overruled.

**B. Manifest Weight of the Evidence**

{¶ 30} In the second assignment of error, Coleman contends that his convictions are against the manifest weight of the evidence.

{¶ 31} A "manifest weight challenge questions whether the prosecution has met its burden of persuasion." *Bowden*, 2009-Ohio-3598 at ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 390. When reviewing a manifest weight challenge, an appellate court, "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Virostek*, 2022-Ohio-1397, ¶ 54, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins*, 78 Ohio St.3d at 387, quoting *Martin* at 175.

{¶ 32} As this court has previously stated:

> The criminal manifest weight of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541 (1997). Under the manifest weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's? *Wilson* at *id*. Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight

of the evidence. *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 2000-Ohio-276, 723 N.E.2d 1054 (2000).

> When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Wilson* at *id.*, quoting *Thompkins* at *id.*

*State v. Williams*, 2020-Ohio-269, ¶ 86-87 (8th Dist.).

{¶ 33} Coleman contends the trial court lost its way because the evidence supports his theory that the unknown individual shot Hoffman. He contends that the video played at trial clearly depicts the unknown individual pointing a firearm at Hoffman the moment before Hoffman fell to the ground. Furthermore, Coleman contends that there was no conflicting testimony given because the only witnesses were law enforcement and forensic witnesses. The court, however, was able to weigh the video and the forensic testimony and found the State's evidence more persuasive by concluding that Coleman shot at Hoffman. Therefore, the second assignment of error is overruled.

{¶ 34} Accordingly, judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The appellant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

LISA B. FORBES, P.J., and
SEAN C. GALLAGHER, J., CONCUR