[Cite as *State v. Brady*, 2026-Ohio-523.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

  v.

JUSTIN RENE LAVAUGHN BRADY,

    DEFENDANT-APPELLANT.

CASE NO. 9-24-65

OPINION AND
JUDGMENT ENTRY

Appeal from Marion County Common Pleas Court
General Division
Trial Court No. 23-CR-305

Judgment Affirmed

Date of Decision: February 17, 2026

APPEARANCES:

    *W. Joseph Edwards* for Appellant

    *Allison M. Kesler* for Appellee

Case No. 9-24-65

**MILLER, J.**

{¶1} This case arises from a July 21, 2023 incident in which Justin Rene Lavaughn Brady ("Brady") shot and killed his sleeping roommate, D'Jontaez Ross ("Ross"). On July 26, 2023, the Marion County Grand Jury indicted Brady on seven counts: Count One of aggravated murder in violation of R.C. 2903.01(A) and 2929.02(A), an unclassified felony; Count Two of aggravated murder in violation of R.C. 2903.01(B) and 2929.02(A), an unclassified felony; Count Three of murder in violation of 2903.02(A), (D) and 2929.02(B), an unclassified felony; Counts Four and Five of murder in violation of R.C. 2903.02(B), (D) and 2929.02(B), unclassified felonies; Count Six of felonious assault in violation of R.C. 2903.11(A), (D)(1)(a), a second-degree felony; and Count Seven of felonious assault in violation of R.C. 2903.11(A)(2), (D)(1)(a), a second-degree felony. All seven counts included 3-year firearm specifications pursuant to R.C. 2941.145(A). At the arraignment hearing held on July 31, 2023, Brady entered not-guilty pleas to the counts in the indictment.

{¶2} A jury trial was held on October 15-17, 2024. At the conclusion of the trial, the jury returned guilty verdicts as to each charge and specification.[1] The trial court accepted the jury's verdicts, found Brady guilty, and continued the matter for the preparation of a presentence investigation.

---

[1] Prior to the conclusion of the trial, the State made a motion to dismiss Count Two of the indictment which the trial court granted.

-2-

{¶3} On December 12, 2024, Brady appeared for sentencing. The trial court found all of the counts merged for sentencing, and the State elected to have Brady sentenced on Count One (aggravated murder). The trial court sentenced Brady to life in prison without the possibility of parole and an additional three-year prison term for the firearm specification. The following day, the trial court filed its judgment entry of sentence.

{¶4} On December 16, 2024, Brady filed his notice of appeal raising a single assignment of error.

## Assignment of Error

**The trial court erred in entering a finding of guilty because the verdict was against the manifest weight of the evidence.**

{¶5} In his assignment of error, Brady argues that his conviction is against the manifest weight of the evidence. Specifically, he argues that the jury lost its way by finding that Brady ended Ross's life with prior calculation and design. For the reasons that follow, we disagree.

### *Standard of Review*

{¶6} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[] the evidence and all reasonable inferences, consider[] the credibility of witnesses and determin[e] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction

-3-

must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 2012-Ohio-5233, ¶ 9 (3d Dist.), quoting *State v. Hunter*, 2011-Ohio-6524, ¶ 119.

### Brady's Offense

{¶7} Brady was convicted of aggravated murder in violation of R.C. 2903.01(A), which provides that "[n]o person shall purposely, and with prior calculation and design, cause the death of another[.]" "The element of prior calculation and design 'require[s] a scheme designed to implement the calculated decision to kill.'" *State v. McFarland*, 2020-Ohio-3343, ¶ 31, quoting *State v. Cotton*, 56 Ohio St.2d 8, 11 (1978). "The amount of care or time that the defendant spends in planning and analyzing the crime are not critical factors in themselves; however, they '"must amount to more than momentary deliberation."'" *State v. Jones*, 91 Ohio St.3d 335, 345 (2001), quoting *State v. Taylor*, 78 Ohio St.3d 15, 19 (1997), quoting the 1973 Legislative Service Commission comments to R.C. 2903.01.

{¶8} "There is no bright-line test to distinguish between the presence or absence of prior calculation and design; each case depends upon its own facts." *State v. Ford*, 2019-Ohio-4539, ¶ 319, citing *State v. Walker*, 2016-Ohio-8295, ¶ 18. Three factors, outlined by the Supreme Court in *State v. Taylor*, 78 Ohio St.3d 15, 19 (1997), have traditionally been considered to determine whether prior calculation and design exists: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events?'" *Taylor* at 19, quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102 (8th Dist. 1976).

*Trial Testimony*

{¶9} On July 21, 2023, law enforcement was dispatched to an apartment at 290 Libby Lane, Marion, Ohio after Brady called dispatch to report that he had just committed a homicide. Brady surrendered at the scene and was immediately arrested. When law enforcement searched the apartment, they discovered Brady's roommate, Ross, lying dead on the living room couch with a single gunshot wound to his forehead. Notably, law enforcement observed no blood splatter on the back of the couch, back of the couch pillows, or blood on the walls behind the couch.

{¶10} Investigators recovered a gun located in the kitchen of the apartment. Subsequent DNA testing of the gun identified Brady's DNA on the firearm, including on the trigger, the inside and outside of the guard, grip, front

sight, and magazine. Ballistics testing of the firearm determined that the gun fired the bullet that was recovered from Ross's body during the autopsy.

**{¶11}** Detective Matthew Baldridge ("Detective Baldridge") with the Marion Police Department testified regarding the interview he conducted with Brady several hours after the crime. According to Detective Baldridge, Brady told him that he and his roommate, Ross, initially got along well, but the relationship began to deteriorate and the two began arguing often.

**{¶12}** Brady informed Detective Baldridge that earlier in the evening of July 21, 2023, he and Ross had an argument and, as a result, Brady left the residence on his bicycle taking his firearm with him. Several hours later, Brady returned to the apartment and found that the apartment door was locked. As a result, Brady had to enter his apartment by crawling through his bedroom window and subsequently unlock the door to bring his bicycle inside.

**{¶13}** Initially, Brady told Detective Baldridge that he and Ross had an argument when he returned to the apartment, and Brady claimed he shot Ross while he was standing up. However, eventually Brady admitted he shot Ross while Ross was lying down. Brady also admitted to Detective Baldridge that being locked out of the apartment is what set him off and was the reason he shot Ross. A recording of Detective Baldridge's interview of Brady, State's Exhibit 25, was played for the jury and was consistent with Detective Baldridge's testimony.

{¶14} State's Exhibit 20, a recording from a neighbor's outdoor security camera from July 21, 2023 was also played during the trial. The video depicts an individual riding a bicycle into the frame and into the alcove by the door of Brady's apartment and then getting off the bicycle. The person then appears to walk off the screen, around the backside of the building.

{¶15} Approximately three minutes later, Brady is seen exiting the apartment and bringing the bicycle into the apartment. State's Exhibit 20 depicts that, approximately ten minutes later, the kitchen light of the apartment turns on and then turns off a few minutes later. A photograph of the living room of the apartment was shown to the jury depicting Brady's bicycle in the same room as Ross's body.

{¶16} At trial, a 911 call placed by Brady on June 2, 2023, several weeks before the incident, was played for the jury. In that call, Brady informed the dispatcher that he had a roommate that he wanted removed from his home. Brady informed the dispatcher that "I'm not trying to be the bad guy and potentially be the one on the next murder crime scene." (State's Ex. 1).

{¶17} Major Chris Adkins performed a firearm trace of the firearm found at the scene. The firearm trace indicated that the firearm was purchased by Brady on June 30, 2023, less than one month prior to the incident, at a local firearm dealer. (*See* State's Ex. 21).

{¶18} State's Exhibit 18, a text message conversation between Brady and a friend on July 17, 2023, four days before the incident, was entered into evidence

and the relevant portions of the conversation were read into the record by Detective Michael Diem. In that text message conversation, Brady stated to his friend, "And [Ross is] doing [this] for no reason. My house didn't look like this until he got here. And the reason why I'm asking you for advice is because I want to put a bullet between his eyebrows and call it a day. But I'm trying to see if there's any other way I can handle this before I go to jail for this man destroying my home." (Oct. 15-17, 2024 Tr. at 204-205). (*See* State's Ex. 18). In that same conversation, Brady stated, "Okay. Thanks for the advice. Just had to ask because I'm not trying to be that person and pull the trigger. But I'm not going to lie, I'm waiting for him to fuck up at the same time. I don't know why, but he [has] just been trying to get real out-of-pocket, and I'm trying to be an adult about this. But he's making it difficult[.]" (Oct. 15-17, 2024 Tr. 204-206). (*See* State's Ex. 18).

{¶19} The State rested, and Brady took the stand in his own defense.

{¶20} Brady testified that he moved into the Libby Lane apartment in Marion, Ohio in June 2020. According to Brady, several months before the incident, Ross, who was homeless at the time, asked to move in with him, and Brady agreed. Brady testified that eventually the living situation soured and in April of 2023, Ross began threatening Brady, drinking to excess, and behaving erratically.

{¶21} According to Brady, on the evening of July 21, 2023, he and Ross got into an argument after Ross claimed that Brady stole from him. As a result, Brady

claimed he left the apartment to de-escalate the situation. Because it was late, Brady took his firearm with him and spent some time riding his bicycle around the area.

**{¶22}** When Brady returned home, he discovered the door of the apartment was locked, which upset him. According to Brady that "blew [him] over the top" and he "just lost control." (Oct. 15-17, 2024 Tr. at 385). Brady testified that he then had to enter the apartment through his window and became even more "enraged" because he fell through the window. (*Id.* at 386). Brady stated that in "blind anger" he "just went ahead and shot [Ross] while he was sleeping." (*Id.*).

**{¶23}** According to Brady, after shooting Ross, he brought his bicycle inside and called his friend to explain the situation and ask for advice. Brady stated that, after talking to his friend, he then called police to report the shooting.

**{¶24}** Brady also stated that after the shooting, he turned on the kitchen light because "I never confirmed if I actually made the kill shot. So I turned it on just to be sure. And that's when I confirmed to myself and [my friend on the phone] that I made the shot." (Oct. 15-17, 2024 Tr. at 392).

*Analysis*

**{¶25}** On appeal, the only element of his aggravated-murder conviction that Brady challenges is whether he caused Ross's death with "prior calculation and design." R.C. 2903.01(A). Brady contends his actions were not planned and were committed in a blind rage. After reviewing the evidence, we disagree.

{¶26} With respect to the first *Taylor* factor, Brady testified that, at the time of the incident, he and Ross had a very strained relationship. The strained nature of the relationship was evidenced by the 911 call that Brady made to the Marion Police Department in the month prior to the shooting complaining of his rage and anger toward Ross, even referencing the possibility of being part of the next "murder scene." (State's Ex. 1). Accordingly, over a month prior to the shooting, the relationship had deteriorated to such a degree that Brady referenced ending Ross's life to the dispatcher. Further, evidence of Brady's premeditation was contained in the text communications between Brady and his friend wherein Brady complained about Ross and stated that he "want[ed] to put a bullet between his eyebrows and call it a day" and referenced wanting to "pull the trigger." (State's Exhibit 18). Moreover, Brady testified that earlier in the evening of July 21, 2023, he and Ross had gotten into an argument and that Ross accused Brady of stealing from him.

{¶27} With reference to the second *Taylor* factor, the evidence demonstrates that Brady had taken steps in the several months leading up to the shooting to plan the crime. First, the 911 call on June 2, 2023 referencing the "murder scene" demonstrated that Brady had considered ending Ross's life and was expressing those feelings to others.

{¶28} Moreover, on June 30, 2023, less than a month prior to the incident, Brady purchased the firearm used to kill Ross at a local firearms dealer. Then, just four days prior to killing Ross by shooting him in the middle of his forehead, Brady

sent text messages to his friend referencing "put[ting] a bullet between [Ross's] eyebrows." Brady also stated that he was waiting for Ross to "fuck up." Furthermore, on July 21, 2023, Brady brought his firearm with him when he left the apartment for several hours.

{¶29} With respect to the third factor, whether the act was drawn out or "an almost instantaneous eruption of events," Brady alleges that his actions were an instantaneous eruption of events. He claimed he became so enraged upon being locked out of the apartment that he immediately, without thinking clearly and in a fit of blind rage, shot and killed Ross.

{¶30} However, Brady's text message to his friend referencing waiting for Ross to "fuck up," combined with the other evidence of Brady's planning, including purchasing a firearm, call into question the instantaneous eruption of events. Being accused of theft and then locked out of the apartment seem to be just the "excuse" for which Brady told his friend he was waiting, before doing something drastic to Ross. The evidence also suggests that when Brady found Ross sleeping on the couch, he recognized the opportunity to catch Ross off guard and kill him without Ross having the opportunity to avoid Brady or fight back.

{¶31} Brady's testimony that he turned on the kitchen light so that he could confirm to his friend on the phone that he made the "kill shot" also leads credence to Brady's intention and planning.

**{¶32}** Furthermore, even if Brady's actions in ending Ross's life occurred quickly, "they evinced his 'determin[ation] to complete a specific course of action' and allowed the jury to infer 'that he had adopted a plan to kill.'" *State v. Nicholson*, 2024-Ohio-604, ¶ 61, quoting *State v. Conway*, 2006-Ohio-791, ¶ 46. *See State v. Ford*, 2019-Ohio-4539, ¶ 320 (finding evidence of prior calculation and design where the defendant shot the victim while he slept); *State v. Cassano*, 2002-Ohio-3751, ¶ 80-84 (upholding an aggravated-murder conviction where the offender had previously threatened to kill the victim).

**{¶33}** Accordingly, we find that the jury did not lose its way by finding that Brady's actions in ending Ross's life were made with prior calculation and design.

**{¶34}** Brady's assignment of error is overruled.

*Conclusion*

**{¶35}** Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the Marion County Court of Common Pleas.

***Judgment Affirmed***

**WILLAMOWSKI, and WALDICK, J. J., concur.**

# JUDGMENT ENTRY

For the reasons stated in the opinion of this Court, the assignment of error is overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered.  The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket.  See App.R. 30.

_____
Mark C. Miller, Judge

_____
John R. Willamowski, Judge

_____
Juergen A. Waldick, Judge

DATED:
/jlm